**UNITED STATES COURT OF APPEALS**
**FOR THE FIRST CIRCUIT**

No. 20-1802

EQUAL MEANS EQUAL; THE YELLOW ROSES; KATHERINE WEITBRECHT,
*Plaintiffs-Appellants,*
v.
DAVID S. FERRIERO,
In his Official Capacity as Archivist of the United States,
*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

# BRIEF OF PLAINTIFFS-APPELLANTS EQUAL MEANS EQUAL, THE YELLOW ROSES, AND KATHERINE WEITBRECHT

Wendy Murphy, Esq.,
Women's and Children's Advocacy Project
New England Law | Boston
154 Stuart Street
Boston, MA 02116

On the brief:
Alison Shea, Esq.

# TABLE OF CONTENTS

**CORPORATE DISCLOSURE** .......... i

**STATEMENT IN SUPPORT OF ORAL ARGUMENT** .......... ii

**TABLE OF AUTHORITIES** .......... iii–xiii

**JURISDICTION STATEMENT** .......... 1–2

**STATEMENT OF ISSUES** .......... 2

**STATEMENT OF THE CASE** .......... 2–4

**APPELLANTS** .......... 4

I. EQUAL MEANS EQUAL .......... 4–5

II. THE YELLOW ROSES .......... 5–6

III. KATHERINE WEITBRECHT .......... 6

**SUMMARY OF ARGUMENT** .......... 6–8

**ARGUMENT** .......... 8

I. THE ERA IS PART OF THE CONSTITUTION BECAUSE THREE-FOURTHS OF THE STATES HAVE RATIFIED IT .......... 8–9

II. THE ERA'S RATIFICATION DEADLINE IS UNCONSTITUTIONAL .......... 9–15

III. THE ARCHIVIST UNLAWFULLY REFUSED TO PUBLISH THE ERA .......... 15–16

IV. APPELLANTS HAVE STANDING .......... 17–18

**A. Injury in Fact** .......... 18

1. Appellants Have a Protectable Legal Interest in the ERA's Continued Vitality .......... 18–20

2. Appellants Have a Protectable Legal Interest in the ERA's Presumptive Validity .......... 20–24

3. The Organizational Appellants Suffered Injury Because the Archivist Interfered with Their Mission and Caused Them to Divert Resources in Order to Identify and Counteract His Unlawful Actions and Inactions ........ 24

*i. Equal Means Equal – Diversion of Resources* .....................24–26

*ii. Equal Means Equal – Frustration of Mission*.......................26–27

4. Equal Means Equal – Associational Standing ...............................27

*i. EME's Members Have Standing in Their Own Right*.................................................................28

5. The Yellow Roses – Organizational Standing ..............................28

6. The Organizational Appellants Have Suffered Injury Because the Archivist's Actions Have Interfered with Their Activities.................................................28–29

7. Injury to Katherine Weitbrecht ................................................29–30

**CONCLUSION**...........................................................................................30

**CERTIFICATE OF COMPLIANCE** ...........................................................31

**ADDENDUM**......................................................................................... Tab A

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1, Plaintiffs-Appellants hereby disclose that they are not a publicly held corporation, have no parent companies, and no companies have a 10% or greater ownership in them.

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Pursuant to Rule 34.0(a) Appellants respectfully submit that oral argument is appropriate because this case raises important questions of first impression and of national significance; regarding how our nation's foundational document is amended, whether the Equal Rights Amendment is now the 28th Amendment to the U.S. Constitution, and whether women have Article III standing to challenge unlawful government action that interferes with the vitality of the Equal Rights Amendment and their ability to enjoy fully equal protection of law.

# TABLE OF AUTHORITIES

**Cases**

*African Community's Together v. Trump*,

No. 19-10432-TSH, LEXIS 184688 (D. Mass. 2019).....................26, 27, 28

*American Canoe Association* v. *City of Louisa Water and Sewer Commission*,

389 F.3d 536 (6th Cir. 2004) .......................................................................27

*Barrows v. Jackson*,

346 U.S. 249 (1953).....................................................................................22

*Blum v. Holder*,

744 F.3d 790 (1st Cir. 2014).........................................................................18

*Bostock v. Clayton County*,

590 U.S. ___ (2020).........................................................................................8

*Boston's Children First v. Boston Sch. Comm.*,

183 F. Supp. 2d 382 (D. Mass. 2002)...................................................24–25

*Bradwell v. Illinois*,

83 U.S. (16 Wall.) 130 (1873) .......................................................................9

*Brzonkala v. Virginia Polytechnic Institute and State University*,

132 F.3d 949 (4th Cir. 1997) .......................................................................23

*Carmen v. Idaho*, Pet. of Adm'r of Gen. Servs. for Writ of Cert.,

No. 81-1313 (U.S. Jan. 22, 1982)................................................................20

*Carson v. Makin*,

979 F.3d 21 (1st Cir. 2020)....................................................................8, 21

*City of Boerne v. Flores*,

521 U.S. 507 (1997)..........................................................................................16

*Coleman v. Miller,*

307 U.S. 433 (1939)..................................................................................passim

*Craig v. Boren*,

429 U.S. 190 (1976)...................................................................................... 8, 24

*Des Vergnes v. Seekon Water Dist.*,

601 F.2d 9 (1st Cir. 1979)................................................................................ 22

*Diamond v. Charles*,

476 U.S. 54 (1986),........................................................................................... 20

*Dillon v. Gloss*,

256 U.S. 368 (1921)..................................................................................passim

*Fair Housing of Mann v. Combs*,

285 F.3d 899 (9th Cir. 2002) ............................................................................ 26

*FEC v. Akins*,

524 U.S. 11 (1998)............................................................................................. 18

*Feeley v. Sampson*,

570 F.2d 364 (1st Cir. 1978).............................................................................. 23

*Frontiero v. Richardson*,

411 U.S. 677 (1973).......................................................................... 24

*Garita Hotel Ltd. P'ship v. Ponce Fed. Bank*,

958 F.2d 15 (1st Cir. 1992)..........................................................1–2

*Glidden v. Zdanok*,

370 U.S. 530 (1962)..........................................................................4

*Grutter v. Bollinger*,

539 U.S. 244 (2003)..........................................................................21

*Havens Realty Corp. v. Coleman*,

455 U.S. 363 (1982)....................................................................24, 28

*Hooker v. Weathers*,

990 F.2d 913 (6th Cir. 1993) ......................................................26, 28

*Hunt v. Washington, State Apple Advert. Comm'n*,

432 U.S. 333 (1977)....................................................................27, 28

*Idaho v. Freeman*,

529 F. Supp. 1107 (D. Idaho 1981) ......................................passim

*Idaho v. Freeman*,

625 F.2d 886 (9th Cir. 1980) ................................................ 8, 18, 19

*Idaho Farm Bureau Fed'n v. Babbitt*,

58 F.3d 1392 (9th Cir. 1995) ...........................................................29

*Int'l Union, United Automobile, Aerospace and Agricultural Implement Workers v. Brock*,

477 U.S. 274 (1986)....................................................................27

*Jacobsen v. Massachusetts*,

197 U.S. 11 (1905)....................................................................13

*Jones v. DeSantis*,

4:19-cv-300-RH/MJF (N.D. Fla. 2020)..........................................26, 27, 28

*Leser v. Garnett*,

258 U.S. 130 (1922)....................................................................16

*Lujan v. Defenders of Wildlife*,

504 U.S. 555 (1992)....................................................................17

*Marbury v. Madison,*

5 U.S. (1 Cranch) 137 (1803) ......................................................16

*Massachusetts v. Environmental Protection Agency*,

549 U.S. 497 (2007)....................................................................18

*Massachusetts v. Mellon*,

262 U.S. 447 (1923)....................................................................22

*Mississippi v. Hogan*,

458 U.S. 718 (1982)....................................................................34

*Nat'l Council of La Raza v. Cegavske*,

800 F.3d 1032 (9th Cir. 2015) ......................................................26

*Nat'l Org. for Women, Inc. v. Idaho*,

459 U.S. 809 (1982)........................................................................9–10, 19

*Nat'l Org. for Women, Inc. v. Idaho*, Mem. For Adm'r of Gen. Servs.,

Nos. 81-1282 et al. (U.S. July 9, 1982) ......................................................10

*Nat'l Org. for Women, Inc. v. Idaho*, Pet. for Writ of Cert.,

No. 812-1283 (U.S. Jan. 8, 1982).................................................... 10, 20

*Northeastern Fla. Chapter of Assoc. Gen Contractors of America v. Jacksonville*,

508 U.S. 656 (1993)........................................................................ 8

*Northland Family Planning Clinic, Inc. v. Cox*,

487 F.3d 323 (6th Cir. 2007) ........................................................29

*Plyer v. Doe*,

457 U.S. 202 (1982)........................................................................23

*Real Estate Bar Ass'n for Mass., Inc. v. Nat'l Real Estate Info Servs.*,

608 F.3d 110 (1st Cir. 2010)........................................................ 4

*Reddy v. Foster*,

845 F.3d 493 (1st Cir. 2017)........................................................17

*Reed v. Reed*,

404 U.S. 71 (1971)........................................................................ 9

*R.I. Comm'n for Human Rights v. Graul*,

120 F. Supp. 3d 110 (D.R.I. 2015) ..............................................26, 27, 28

*Sagebrush Rebellion, Inc. v. Watt*,

713 F.2d 525 (9th Cir. 1983), *aff'd*, 790 F.2d 760 (9th Cir. 1986) ..............29

*Sierra Club v. Marsh*,

872 F.2d 497 (1st Cir. 1985)..................................................................21

*Singleton v. Wulff*,

428 U.S. 106 (1976)............................................................................ 4

*Smith v. Pac. Props. & Dev. Corp.*,

358 F.3d 1097 (9th Cir. 2004) ..............................................................26

*Susan B. Anthony List v. Driehaus*,

573 U.S. 149 (2014)......................................................................... 17–18

*Trades v. Spellman*,

684 F.2d 627 (9th Cir. 1982), *cert denied,* 461 U.S. 913 (1983) .................29

*United States ex. rel. Widenmann v. Colby*,

265 F. Supp. 998 (D.C. Cir. 1920) ..........................................................16

*United States v. Sprague*,

282 U.S. 716 (1931)............................................................................ 9

*United States v. Virginia,*

518 U.S. 515 (1996)...................................................................... 23–24

*Virginia et al., v. Ferriero*,

1:20-cv-242-RC (D.D.C. 2020)............................................................ 17, 22

*Wartth v. Seldin*,

422 U.S. 490 (1975)....................................................................27

**United States Constitution**

U.S. CONST. Art. I ....................................................................13

U.S. CONST. Art. III....................................................................passim

U.S. CONST. art. V ....................................................................passim

U.S. CONST. amend. XVIII ..........................................................passim

U.S. CONST. amend. XIX ..............................................................14

U.S. CONST. amend. XXI ..............................................................14

U.S. CONST. amend. XXII..............................................................14

U.S. CONST. amend. XXIII ............................................................14

U.S. CONST. amend. XXIV ............................................................14

U.S. CONST. amend. XXV ..............................................................14

U.S. CONST. amend. XXVI ............................................................14

U.S. CONST. amend. XXVII..........................................................passim

U.S. CONST. amend. XXVIII ........................................................passim

**Statutes**

1 U.S.C. § 106b ........................................................................passim

28 U.S.C. § 1291 ........................................................................1

28 U.S.C. § 1331 ........................................................................1

28 U.S.C. § 1343 .................................................................................................. 1

Mass.G.L. c.265, § 39 ........................................................................................... 6

**Rules**

Federal Rule of Civil Procedure 12(b)(1) ........................................................ 1, 3

Federal Rule of Civil Procedure 12(b)(6) ............................................................ 3

**Other Authorities**

86 Stat. 1523 (1972)................................................................................. passim

92 Stat. 3795 (1978).......................................................................................14

10 Cong. Rec. 6628 (1955) ...........................................................................14

75 Cong. Rec. 3856 (1932) ........................................................................ 13–14

118 Cong. Rec. 9419 (1972) 5

Clarke, J., *Frontiers of Sex Discrimination Law*,

115 MICH. L. REV. 809 (2017).....................................................................23

Congressional Pay Amendment*, Opinions of the Office of Legal Counsel of the Dep't of Justice*,

16 Op. O.L.C. 85 (May 13, 1992) ...............................................................11

Dellinger, W., *The Legitimacy of Constitutional Change: Rethinking the Amendment Process*,

97 HARV. L. REV. 386 (1983) .......................................................................14

THE FEDERALIST NOS. 43 (Alexander Hamilton), NO. 39 (James Madison) ... 12–13

H. Con. Res. 120–102nd Congress (1991-1992) ....................................................11

*Hearings on H.J. Res. 134 Before the Subcomm. On Civ. and Const. Rights of the H. Comm. On the Judiciary*,

95th Cong. 57 (1978) ....................................................................................13

Hatzenbuehler, M. L., et al., *State-Level Polices and Psychiatric Morbidity in Lesbian, Gay, and Bisexual Populations*,

99 AM. J. PUB. HEALTH (12) 2275 (2009)....................................................22

Ho, J., *Finding Out What it Means to Me: The Politics of Respect and Dignity in Sexual Orientation Antidiscrimination*,

2017 UTAH L. REV. 463 (2017) ......................................................................22

H.R. conf. rep. no. 103–711 (1994) ..................................................................23

Jackson, V., *Constitutional Dialogue and Human Dignity: States and Transnational Constitutional Discourse*,

65 MONT. L. REV. 15 (2004)...........................................................................22

Kalfus, M., *Why Time Limits on the Ratification of Constitutional Amendments Violate Article V*,

66 U. CHI. L. REV. 437 (1999) ........................................................................12

Kreiger, N., *Discrimination and Health Inequities*,

44 INT'L J. HEALTH SERV. (4) 643 (2014) ....................................................22

Letter from State Attorneys General to U.S. Congress (February 22, 2020),

https://portal.ct.gov/-/media/AG/Press_Releases/2019/2112020 Multistate-LT-to Congress-re-ERA.pdf?la=en ..........................................................18

NATIONAL ARCHIVES AND RECORDS ADMINISTRATION: EQUAL RIGHTS AMENDMENT, LIST OF STATE RATIFICATION ACTIONS,

https://www.archives.gov/files/foia/pdf/era-list-of-state-ratification-actions-03-24-2020.pdf ..........................................................................3, 15

*National Organization for Women, An Intersectional Approach to the ERA*,

https://now.org/wp-content/uploads/2017/04/The-ERA_-An-Intersectional-Approach-8.pdf ........ 8–9

NEALE, T., CONG. RESEARCH SERV., R42979, THE PROPOSED EQUAL RIGHTS AMENDMENT: CONTEMPORARY RATIFICATION ISSUES (2018) ........ 24

Press Statement, NARA, Statement on the Equal Rights Amendment (2020),

https://www.archives.gov/press/press-releases-4 ........ 17

Ratification of the Equal Rights Amendment, *Opinions of the Office of Legal Counsel of the Dep't of Justice*,

44 Op. O.L.C. __ (released January 8, 2020) ........ 11

S. Con. Res. 120-102nd Congress (1991-1992) ........ 11

SENATE JUDICIARY COMMITTEE,

*The Response to Rape: Detours on the Road to Equal Justice* (1993) ........ 23

*Suffolk University/USA Poll*, October 2018,

https://www.suffolk.edu/-/media/suffolk/documents/academics/research-at-suffolk/suprc/polls/national/2018/10_25_2018_marginals_pdftxt.pdf?la=en & hash=7303DAC9B701D7E65632FEDDF60B260C8 983B994. ........ 10

*Thomas Reuters Foundation Survey*, June 25, 2018,

https://news.trust.org/item/2018061242134-9jrem. ........ 21

*Thomas Reuters Foundation Survey*, June 26, 2018,

https://news.trust.org/item/20180612134519 ........ 21

*U.N. General Assembly, In- Depth Study on All Forms of Violence Against Women: Report of the Secretary General* (6 July 2006),

A/61/122/Add.1 ........ 21

*U.N. Women, Investing in Gender Equality and Women's Empowerment* (2010), https://www.endvawnow.org/en/articles/314-investing-in-gender-equality-and-womens-empowerment-.html ............................................................21

## JURISDICTIONAL STATEMENT

This is an appeal from a final judgment of the United States District Court for the District of Massachusetts disposing of Plaintiff's claims under Fed. R. Civ. P. 12(b)(1). (J.A. 1–30).[1] The District Court had jurisdiction over Plaintiff's claims under 28 U.S.C. § 1331, 1343. This Court has jurisdiction of this appeal pursuant to 28 U.S.C. § 1291. Final judgment was entered in the lower court on August 6, 2020. (J.A. 35). Plaintiffs filed a timely notice of appeal on August 13, 2020. (J.A. 35).

An appellate court reviews the granting of a motion to dismiss *de novo*, applying the same criteria as the court below. *Garita Hotel Ltd. P'ship v. Ponce Fed. Bank, F.S.B.*, 958 F.2d 15, 17 (1st Cir. 1992). Factual averments in the Complaint are taken as true, indulging every reasonable inference in Appellants' favor. *Id*.

## STATEMENT OF ISSUES

1. Whether the Equal Rights Amendment is now the 28th Amendment to the U.S. Constitution because three-fourths of the States have ratified it.
2. Whether Appellee Archivist of the United States (Archivist) violated his mandatory and nondiscretionary duty under 1 U.S.C. § 106b when he refused to publish the ERA after he was notified that three-fourths of the States had ratified it.
3. Whether Appellant EME et al. have standing under Article III where they allege ample facts demonstrating that the actions and inactions of the Archivist caused them to suffer cognizable legal injury.

[1] Citations to the Joint Appendix are identified with "J.A. #." Citations to the Addendum to Appellants' Brief are identified with "Add. #."

## STATEMENT OF THE CASE

This case asks whether the Equal Rights Amendment (ERA) is the 28th Amendment to the U.S. Constitution. Appellants (EME et al.) contend that it is, because three-fourths of the States have ratified it in accordance with Article V of the Constitution. Appellee Archivist of the United States (Archivist) contends that it is not, because the last necessary State ratified the ERA after a ratification deadline expired. As argued at length below, the ratification deadline is unconstitutional, thus void, and the ERA is now the 28th Amendment.

Article V provides that an amendment to the Constitution "shall be valid to all intents and purposes, . . . when ratified by the legislatures of three fourths of the several states." U.S. Const art. V. (Add. 1).

The Equal Rights Amendment (ERA) states, "Equality of rights under the law shall not be denied or abridged by the United States or by any state on account of sex." 86 Stat. 1523 (1972). (J.A. 40).

In furtherance of Article V, once three-fourths of the States have ratified an amendment, the Archivist must publish it "forthwith." 1 U.S.C. § 106b. (Add. 2).

When the ERA was sent to the States for ratification in 1972 it included a seven-year ratification deadline in its preamble. As the deadline neared and only 35 of 38 necessary states had ratified, it was extended to 1982, but no additional states ratified. (J.A. 40–41).

In 1992, the 27th Amendment was ratified, some 203 years after its proposal by Congress. (J.A. 41).

In 2012, the Archivist released a letter stating that he would record States' ERA ratification votes if they occurred after expiration of the deadline, and that he would publish the ERA if 38 States voted to ratify it. (J.A. 63–64). In 2017 Nevada ratified the ERA. Illinois became the 37th State to ratify it in 2018. (J.A. 37).

On December 12, 2019, the Archivist announced that he would not publish the ERA if 38 States ratified it until he received legal advice from the Office of Legal Counsel (OLC) at the Department of Justice. (J.A. 38).

On January 7, 2020, EME et al. filed this action. (J.A. 33).

Virginia became the last necessary state to ratify the ERA in January 2020. (J.A. 37). The Archivist subsequently refused to publish the ERA because the OLC issued a memorandum on January 8, backdated to January 6, opining that the ERA could not be published because its ratification deadline had expired. (J.A. 38, 47).

On March 24, 2020, the Archivist recorded Virginia's ERA ratification vote but persisted in his refusal to publish the ERA. NATIONAL ARCHIVES AND RECORDS ADMINISTRATION: EQUAL RIGHTS AMENDMENT, LIST OF STATE RATIFICATION ACTIONS (available at https://www.archives.gov/ files/foia/pdf/era-list-of-state-ratification-actions-03/24/2020.pdf).

On April 14, 2020, the Archivist filed a Motion to Dismiss under Rules 12(b)(1) and (12(b)(6). (J.A. 33). On August 6, 2020, the District Court granted the Archivist's motion on the grounds that Appellants lack Article III standing. (J.A. 4).[2] On August 13, 2020, Appellants filed a notice of appeal, which was docketed in this Court on August 21, 2020. (J.A. 35–36). On September 10, 2020, Appellants filed a petition for certiorari with the U.S. Supreme Court. (J.A. 36). On October 13, 2020, Appellants' Petition for Certiorari was denied. (J.A. 36). This appeal follows.

## APPELLANTS

### I. EQUAL MEANS EQUAL

Equal Means Equal ("EME") is a national 501(c)(4) non-profit organization whose sole mission and purpose is to advocate for the ERA and eradicate sex inequality. In 2016, EME released an award-winning documentary entitled *Equal Means Equal*, which examined sex inequality, and concluded that ratification of the ERA would mitigate the problem in American society. EME has been instrumental

[2] Although the lower court dismissed Appellants' claims on standing grounds and declined to reach the merits, this Court has discretion to review the merits in the first instance. *Singleton v. Wulff*, 428 U.S. 106 (1976) ("what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals ..."); *Glidden v. Zdanok*, 370 U.S. 530 (1962) (Supreme Court will address issues for first time on appeal if they raise fundamental principles of the structure of the government or government officials' rights and duties.); *see Real Estate Bar Ass'n for Mass., Inc. v. Nat'l Real Estate Info. Servs.*, 608 F.3d 110, 125 (1st Cir. 2010) (addressing issues for first time on appeal where, inter alia, no party was prejudiced or advantaged and court was not deprived of useful fact finding).

in raising awareness about the ERA and helping to ensure its ratification in Nevada, Illinois, and Virginia. EME's president, Kamala Lopez, testified in front of the Illinois legislature in support of their ERA ratification bill. EME has engaged in direct action and educational campaigns in many states and has over twenty-thousand supporters and members. EME's members and supporters donate funds and volunteer their services, enabling EME to carry out its mission. (J.A. 52–55).

The Archivist interfered with EME's mission and interest in the ERA's continued vitality. EME has observed reluctance among government officials and others to comply with the ERA.[3] As a result, EME's mission has been frustrated and it had to divert resources toward training, education and advocacy to identify and counteract Defendant's actions. (J.A. 53–54).

## II. THE YELLOW ROSES

The Yellow Roses ("Roses") is a volunteer student organization, founded in 2016 by a group of female middle school students who were surprised and disappointed to learn that women were not yet equal under the U.S. Constitution. The organization's sole mission is to advocate for and raise public awareness about the importance of sex equality and need for ratification of the ERA. (J.A. 55–56).

[3] Section 3 of the ERA states that it takes effect "two years after the date of ratification." This ensures that government officials have time to bring laws into compliance with the ERA. 118 Cong. Rec. 9419 (1972) (two-year delay in enforcement of ERA is necessary to give federal and state officials adequate time to repair their laws).

The Roses have engaged in numerous advocacy and educational activities related to the ERA, such as teaching young people; circulating a petition; being interviewed by media; meeting with government officials; and collaborating with activists. The Archivist injured the Roses' interest in the ERA's continued vitality, and caused a diversion of their resources, and frustration of their mission. (J.A. 56).

## III. KATHERINE WEITBRECHT

Katherine Weitbrecht suffered a violent attack when a man strangled her because she was wearing a rape whistle. The man had a history of making derogatory comments about women. Ms. Weitbrecht reported the matter to police, but no hate-crime charge could be filed because, as a female, she is excluded from protection under the Massachusetts hate crime statute. G.L. c.265, §39. The offender was charged with a misdemeanor and suffered no serious consequences. (J.A. 56–58).

As a female, Ms. Weitbrecht faces a disproportionate risk of sex-based harm, yet she is now reluctant to report it for fear it will lead to inadequate charges and unjust treatment by law enforcement and the legal system. The Archivist interfered with Ms. Weitbrecht's interest in the ERA's continued vitality, and unlawfully perpetuated the societal conditions that produce her suffering. (J.A. 57–58).

## SUMMARY OF ARGUMENT

The ERA is now the 28th Amendment because three-fourths of the States have ratified it and the congressionally imposed ratification deadline is a legal nullity because Article V nowhere authorizes Congress to impose ratification deadlines on the States.

While the Supreme Court in *Dillon v. Gloss*, 256 U.S. 368 (1921) found implied congressional authority in Article V to set ratification deadlines, *Dillon* is not controlling because the language regarding deadlines is dictum. Further, allowing Congress to impose ratification deadlines on the States violates Article V because it tips the balance of amendatory powers unconstitutionally in favor of the National government, and against the equal amendatory rights of the States.

Even if Congress has authority to impose ratification deadlines, the ERA deadline is unconstitutional because it was placed in a preamble rather than the text of the ERA itself. This difference is important because States have no authority to ratify language in preambles, thus they had no opportunity to decide for themselves whether they wanted their Article V powers restricted by the ERA's time limit.

In *Coleman v. Miller*, 307 U.S. 433 (1939), the issue of congressional authority to impose deadlines was not squarely addressed, and in any event, it was only a plurality decision.

Irrespective of the deadline the Archivist violated his mandatory, nondiscretionary duty of publication set forth in 1 U.S.C. § 106b by refusing to

publish the ERA. He subverted the constitutionally mandated process by which the Constitution is amended, causing harm to Appellants' cognizable legal interest in the ERA's continued vitality. *Idaho v. Freeman*, 625 F.2d 886, 887 (9th Cir. 1980).

EME et al. also have standing under *Northeastern Fla. Chapter of Assoc. Gen. Contractors of America v. Jacksonville*, 508 U.S. 656, 657 (1993) because the Archivist has made it more difficult for them to obtain the benefits of the ERA's presumptive validity. *See Carson v. Makin*, 979 F.3d 21, 21–22 (1st Cir. 2020).

The organizational Appellants have standing under *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) because they suffered a diversion of resources and frustration of mission in order to identify and counteract the Archivist's actions.

## ARGUMENT

### I. THE ERA IS PART OF THE CONSTITUTION BECAUSE THREE-FOURTHS OF THE STATES HAVE RATIFIED IT

The ERA was designed to grant women[4] equality of rights because women were excluded from the 14th Amendment's equal protection guarantee when it was adopted in 1868. *Bradwell v. Illinois*, 83 U.S. (16 Wall.) 130 (1873). Women were

---

[4] The ERA also protects males though males "have not been the victims of the kind of historic pervasive discrimination that has disadvantaged other groups." *Craig v. Boren*, 429 U.S. 190, 214 (1976) (Stevens, J., concurring). It also protects LGBTQ+ persons. *National Organization for Women, An Intersectional Approach to the ERA* (available at https://now.org/wp-content/uploads/2017/04/The-ERA_-An-Intersectional-Approach-8. pdf) *See Bostock v. Clayton County*, 590 U.S. ___ (2020) (the word "sex" in Title VII covers LGBTQ+).

not even recognized as persons under the 14th Amendment until *Reed v. Reed*, 404 U.S. 71 (1971). The ERA is meant to repair the 14th Amendment. It was proposed by Congress and sent to the States for ratification in 1972. 86 Stat. 1523 (1972).

When a proposed amendment is "ratified by the legislatures of three fourths of the several states" it "shall be valid to all intents and purposes, as part of this Constitution . . . " U.S. CONST art. V; *Dillon v. Gloss*, 256 U.S. 368, 376 (1921). Therefore, when Virginia became the last of three-fourths of the States to ratify the ERA, the ERA became the 28th Amendment to the Constitution.

## II. THE ERA'S RATIFICATION DEADLINE IS UNCONSTITUTIONAL

Article V nowhere grants Congress the power to impose ratification deadlines on the States. It says only that Congress may propose amendments and determine the mode of ratification.[5] Therefore, the ratification deadline is a legal nullity.[6]

[5] "Mode" of ratification refers to the choice between ratification and convention. *United States v. Sprague*, 282 U.S. 716, 732–33 (1931) ("the choice of mode rests solely in the discretion of Congress"). Nothing in Article V gives Congress authority to control other aspects of ratification.

[6] The Supreme Court has never ruled that the time for ratification of the ERA has passed. In *Nat'l Org. for Women v. Idaho*, 459 U.S. 809 (1982), the Court remanded the case with instructions "to dismiss the complaints as moot." The *Idaho* case was before the Court on a petition for certiorari from a district court decision in which a judge ruled that Congress had no authority to extend the ERA deadline. *Idaho v. Freeman*, 529 F. Supp. 1107, 1155 (D. Idaho 1981). The federal government and others sought review in the Supreme Court. *See, e.g.*, Pet. of Adm'r of Gen. Servs. for Writ of Cert., *Carmen v. Idaho*, No. 81-1313 (U.S. Jan. 22, 1982); Pet. for Writ of Cert., *Nat'l Org. for Women, Inc. v. Idaho*, No. 81-1283 (U.S. Jan. 8, 1982). The Court granted probable certiorari, but the challenged deadline expired on June 30,

While the Supreme Court in *Dillon* said Article V created implied congressional authority to impose ratification deadlines on the States, that aspect of *Dillon* may be disregarded as dictum because it was not necessary to the Court's holding.

The petitioner in *Dillon* challenged the legitimacy of his punishment for violating the National Prohibition Act. The issue was whether the 18th Amendment became valid on the date the last necessary state ratified it or on the date when the Secretary of State (precursor to the Archivist) published it. The Court held the 18th Amendment became valid when the last state ratified, thus, petitioner's punishment was lawful. There was also a challenge to the constitutionality of the 18th Amendment on the grounds that it had a deadline, but the Amendment was ratified before the deadline expired. Thus, the issue was not relevant to the Court's holding.

*Dillon's* language about deadlines should also be disregarded because it was premised on the arcane notion that States must ratify amendments contemporaneously with congressional proposal to ensure national consensus.[7] *Id*. at 375. *Dillon's*

---

1982, before it could hear argument. The government then urged the Court to dismiss the case as moot on the grounds that the ERA had "failed of adoption no matter what the resolution of the legal issues presented." Mem. for Adm'r of Gen. Servs. Suggesting Mootness at 3, *Nat'l Org. for Women, Inc. v. Idaho*, Nos. 81-1282 et al. (U.S. July 9, 1982). The Supreme Court then dismissed the case, but nowhere adopted the government's language that the case was moot because it "failed of adoption."

[7] Contemporaneous ratification does not ensure national consensus. The 18th Amendment was ratified contemporaneously with congressional proposal but did not accurately reflect consensus as it was repealed a few years later by the 21st Amendment. And though it took 48 years to ratify the ERA, national polling in 2018

requirement of contemporaneity as proof of consensus has not withstood the test of time. In 1992, the Archivist published the 27th Amendment,[8] and Congress voted to validate it,[9] some 203 years after its proposal. No officials rejected the amendment on the grounds that its ratification was not contemporaneous with its proposal by Congress. Nor did any defer to the *Dillon* Court's dual admonitions that a proposed amendment may not remain "open for all time," *Dillon*, 256 U.S. at 374, and that the 27th Amendment was already too old, in 1921, to ratify. *Id.*, at 375. Either *Dillon* is no longer good law, or the 27th Amendment is not part of the Constitution.

Whether Congress may impose ratification deadlines is in doubt for good reason as deadlines disrupt the balance of power by "shift[ing] power granted to the States—and the people—to the Congress." Kalfus, M., *Why Time Limits on the Ratif-*

---

demonstrates clear consensus in support of the ERA. *Suffolk University/USA Poll*, October 2018 (national survey of people in all fifty states found 75% were more likely to vote for a candidate that supports the ERA).

[8] The Archivist readily performed his duty to publish the 27th Amendment despite the passage of 203 years on May 7, 1992, before the Office of Legal Counsel ("OLC") advised him that, "the effective date of the amendment is the date on which it was ratified by the 38th State to do so." Congressional Pay Amendment, *Opinions of the Office of Legal Counsel of the Dep't of Justice*, 16 Op. O.L.C. 85 (May 13, 1992). This 1992 OLC opinion requiring publication of the 27th Amendment because it was ratified by 38 states stands in stark contrast to the OLC's January 8, 2020 opinion forbidding publication of the ERA despite its ratification by 38 states. Ratification of the Equal Rights Amendment, *Opinions of the Office of Legal Counsel of the Dep't of Justice*, 44 Op. O.L.C. __ (released January 8, 2020).

[9] Congress, like the Archivist, has no authority to adjudicate constitutionality, but that is effectively what it did with the 27th Amendment on May 21, 1992. S. Con. Res. 120–102nd Congress (1991–92); H. Con. Res. 120–102nd Congress (1991–92).

*ication of Constitutional Amendments Violate Article V*, 66 U. CHI. L. REV. 437, 452-53 (1999).[10] That Congress could deprive the States of an amendment the States demanded was of "utmost concern to the framers" *Id*.

*Coleman v. Miller*, 307 U.S. 433 (1939) does not support the Archivist's position because *Coleman* involved an amendment with no ratification deadline. The Court determined that Congress has authority under Article V to determine the reasonableness of the passage of time between proposal and ratification for an amendment with no deadline. Since *Coleman*, Congress demonstrated its inability to make such reasonableness determinations when it voted to approve the 27th Amendment in 1992, some 203 years after congressional proposal. In any event, the *Coleman* Court was very divided on the scope of congressional power under Article V, and the ruling itself is not firm precedent as it was only a plurality decision.

Even if Congress has general authority to impose deadlines, it must do so in a constitutional manner, which did not happen with the ERA because the deadline was placed in a preamble rather than in the text of the ERA itself.

---

[10] The problem is not that short deadlines prevent ratification, because a short deadline can also cause states to ratify by subjecting them to undue pressure, as happened with the 18th Amendment, which was quickly repealed. The point is deadlines allow the National government to put pressure on the States in ways that undermine the States' autonomy and equal amendatory powers.

While Congress may include anything in an amendment's text; it may not enact adjunctive laws that undermine the balance of National and State powers set forth in Article V.[11] The Framers were clear that amendatory powers should be equally distributed. THE FEDERALIST NO. 43 (Alexander Hamilton) ("Article V equally enables the general and the States governments"); THE FEDERALIST NO. 39 (James Madison) (Article V makes the amendment process "neither wholly national nor wholly federal.")

Because States' amendatory powers are equal to those of the National government, they may not be abridged by language in a preamble because States do not ratify preambles. If Congress wants to change Article V to favor the National government, it must comply with Article V's rules for changing the Constitution so the States can decide whether they want their Article V rights to be restricted.[12]

While no court has addressed the significance of placing a deadline in the preamble,[13] persuasive legal authority and congressional records strongly suggest that it violates Article V. *See Equal Rights Amendment Extension, Hearings on H.J. Res. 134 Before the Subcomm. On Civ. and Const. Rights of the H. Comm. On the*

---

[11] *Dillon* provides no such authority as the deadline there was in the text.

[12] Just as Congress cannot pass a law abridging the President's presentment powers under Article I, it cannot pass a law abridging the States' amendatory powers under Article V.

[13] In like circumstances, courts have declined to enforce language from preambles on the grounds that they "have never been regarded as the source of any substantive power conferred. . . ." *Jacobsen v. Massachusetts*, 197 U.S. 11, 22 (1905).

*Judiciary*, 95th Cong. 57 (1978) (states were "ratifying the text of the Amendment and not the preliminary language of the resolution"). Indeed, when Congress was proposing to add a deadline to the preamble of the 20th Amendment, members objected on the grounds that placing it in a preamble would be "of no avail" as it would not be "part of the proposed constitutional amendment." 75 Cong. Rec. 3856 (1932). Congress thus placed deadlines in the text of the next three amendments. Dellinger, W., *The Legitimacy of Constitutional Change: Rethinking the Amendment Process*, 97 Harv. L. Rev. 386, 408-09 (1983).

Congress' arbitrary handling of ratification deadlines further supports Appellants' position. No deadlines were included in any amendments for the first 130 years. Deadlines began relatively recently with the 18th Amendment in 1917, and have been used only a handful of times, without consistency. A deadline was imposed on the 18th but not the 19th Amendment Some deadlines were in preambles, while others were in the text. It was not until the 23rd Amendment in 1960 that Congress first placed a deadline in a preamble, claiming a need to "declutter" the text.[14] This continued with the 24th, 25th and 26th Amendments. (J.A. 47). Then in 1978,

[14] 10 Cong. Rec. 6628 (1955). If placing a deadline in a preamble were truly about decluttering why would Congress "clutter" the text of the ERA with procedural matters such as delaying the effective date of the amendment for two years? The States were able to vote on the two-year delay, but not on whether their amendatory rights should be restricted by a rule that forced them to ratify within seven years.

Congress placed a deadline in the text and the preamble of a proposed amendment. 92 Stat. 3795 (1978). Stranger still, Congress voted to approve the 27th Amendment in 1992, and the Archivist published it, 203 years after congressional proposal, belying the idea that ratification deadlines serve a legitimate constitutional purpose.

Apparently of the mind that the ERA deadline was a nullity, the Archivist issued a letter in 2012 stating he was duty-bound to record ERA ratifications and would publish the ERA when 38 states ratified it.[15] (J.A. 63–64). And States that had not yet ratified the ERA similarly determined that the deadline posed no barrier, which is why Nevada ratified in 2017, followed by Illinois in 2018 and Virginia in 2020.[16]

## III. THE ARCHIVIST UNLAWFULLY REFUSED TO PUBLISH THE ERA

Under 1 U.S.C. § 106b, after three-fourths of the States have ratified an

[15] His letter was issued in response to a question from Congresswoman Carolyn Maloney about the ratification status of the ERA and the role of the Archivist. The Archivist replied, "Once NARA receives at least 38 state ratifications of a proposed Constitutional amendment, NARA publishes the Amendment along with a certification of the ratifications and it becomes part of the Constitution." Nowhere did the Archivist indicate a concern about the ERA's validity, though he did state "a later recission of a state's ratification is not accepted as valid." (J.A. 63–64).

[16] The Archivist recorded ratification votes of Nevada and Illinois without controversy when they happened, though he recently added the qualifying statement, "ratification actions occurred after Congress's deadline expired" NATIONAL ARCHIVES AND RECORDS ADMINISTRATION: EQUAL RIGHTS AMENDMENT, LIST OF STATE RATIFICATION ACTIONS (available at https://www.archives.gov/files/foia/pdf/era-list-of-state-ratification-actions-03-24-2020.pdf) He should have similarly published the ERA, adding a notation about the deadline if he felt the need to do so.

amendment, "the Archivist of the United States shall forthwith cause the amendment to be published, with his certificate, specifying the States by which the same may have been adopted, and that the same has become valid, to all intents and purposes, as part of the Constitution of the United States."

The plain language of § 106b makes clear the Archivist's duty of publication is mandatory and ministerial.[17] *Dillon,* 256 U.S. at 376 (that ratification was not proclaimed until January 29, 1919, is not material, "for the date of its consummation, and not that on which it is proclaimed, controls."); *see Leser v. Garnett*, 258 U.S. 130, 137 (1922) (Archivist merely "authenticates" a state's documents). The Archivist has no discretion not to publish. *U.S. ex. Rel. Widenmann v. Colby*, 265 F. Supp. 998, 999 (D.C. Cir. 1920) ("No discretion is lodged in [the Archivist].").

The Archivist has no authority to certify, or decline to certify, an amendment's constitutionality. The power to adjudicate constitutionality rests exclusively with the courts. *City of Boerne v. Flores*, 521 U.S. 507, 524 (1997); *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177-78 (1803). Moreover, Congress clearly did not intend by § 106b to give the Archivist such authority. If it had, it would have stated that the Archivist must determine whether an amendment "has been adopted according to

[17] The only duty in § 106b is the duty to publish amendments and certify which states ratified. Yet the Archivist recorded States' ratification votes (which is not required) while refusing to publish the ERA itself, which is required.

the provisions of the Constitution." Instead, Congress inserted a comma after the word "adopted," making clear the purpose of that phrase was to emphasize that the Archivist's duties, such as acting "forthwith," are constitutionally mandatory. No Archivist in the past has ever "certified" (or decertified) an amendment's validity.[18]

## IV. APPELLANTS HAVE STANDING

Standing is established when a plaintiff shows (1) an 'injury-in-fact' that (2) is 'fairly . . . trace[able] to the challenged action of the defendant' and (3) is 'likely . . . [to] be redressed by a favorable decision' in court." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).[19] A plaintiff has suffered an injury-in-fact

[18] When the 27th Amendment was published in 1992, the Archivist did not "certify" its constitutionality, he simply published it. And despite serious doubts about the Amendment's validity the Archivist nowhere stated, as he did with the ERA, that he or the OLC must determine the amendment's validity.

[19] Appellants' complaint is replete with allegations establishing traceability. As noted throughout, the Archivist interfered with the ERA's vitality and presumptive validity; injured the organizational Appellants; and exposed all persons protected by the ERA to an increased risk of sex-based harms.

The Archivist's actions can also be traced to the refusal of government officials to act in accordance with ERA because several attorneys general submitted pleadings in a different ERA lawsuit stating they will be "forced to spend substantial resources" if the Archivist to publishes the ERA. *Virginia et al., v. Ferriero*, 1:20-cv-242-RC (D.D.C. 2020) (Dk. #10). If Attorneys General will expend resources only when the Archivist publishes the ERA, it is axiomatic that they are not currently complying with the ERA because the Archivist did not publish it.

Further, it cannot be gainsaid that Appellant's injuries will be redressed by a favorable ruling because the Archivist has explicitly stated that he will publish the ERA if directed to do so by a final court order. Press Statement, NARA, Statement on the Equal Rights Amendment (January 8, 2020) (available at https://www.archives.gov/press/press-releases-4).

if she has experienced "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Reddy v. Foster*, 845 F.3d 493, 500 (1st Cir. 2017) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 (2014)). General allegations suffice at the pleading stage. *Lujan*, 504 U.S. at 561.[20]

That an injury may be widespread and generalized does not defeat standing. *Massachusetts v. Environmental Protection Agency*, 549 U.S. 497, 517, 522 (2007); *see FEC v. Akins*, 524 U.S. 11, 24–25 (1998).

**A. Injury in Fact**

1. Appellants Have a Protectable Legal Interest in the ERA's Continued Vitality

Appellants adequately demonstrate standing under *Freeman*, 625 F.2d at 887, because they are all female and/or representative of females as a class, and the Archivist caused catastrophic harm to the ERA's vitality.[21]

[20] The Archivist argued below that the standing inquiry should be "especially rigorous" at this stage because "reaching the merits of the dispute would force [the court] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional," citing *Blum v. Holder*, 744 F.3d 790, 797 (1st Cir. 2014). *Blum* is inapt. It involved a challenge to the legitimacy of a statute and required the judicial branch to impose on and potentially usurp the core functioning of one of the other branches of government. This case asks the Court not to usurp, but rather, to cure usurpation.

[21] In February 2020, Attorneys General from twenty states released a letter agreeing with Appellants' arguments but expressing confusion as to the ERA's validity. "Neither the Constitution nor the language of the ERA [] contain a time limit for state ratification . . . [R]ather than including any [deadline] in the ERA's text,

In *Freeman*, the National Organization for Women ("N.O.W.") was granted standing on behalf of women in a case challenging Congress' authority to extend the ERA's initial seven-year ratification deadline, and States' authority to rescind prior ratifications. *Idaho v. Freeman*, 529 F. Supp. at 1155.[22] This case involves the same type of women's organizations and the same type of legal controversy.

The lower court here ruled that *Freeman* was unavailing because N.O.W. became involved in *Freeman* by filing a motion to intervene and standing to intervene is different than standing to sue. (J.A. 12–13). While intervention standing and Article III standing are not identical, they both require proof of a protectable legal interest. Just as N.O.W. satisfied the protectable legal interest requirement for intervention standing because of its interest in the "continued vitality" of the ERA, Appellants here satisfy the cognizable legal interest requirement for Article III standing because they have an identical legal interest.

---

Congress relegated a seven-year deadline to the joint resolution that proposed the ERA . . . No court has found that such an external limit is at all binding" on the States." Letter from State Attorneys General to U.S. Congress (February 22, 2020) (available at https://portal.ct.gov/-/media/AG/Press_Releases/2019/2112020-Multistate-LT-to-Congress-re-ERA.pdf?la=en) ("Attorneys General Letter"). The Attorneys Generals' confusion was obviously caused by the Archivist's actions as they declared their confidence that the deadline was not valid.

22 The District Court in *Freeman* denied N.O.W. standing, but the Ninth Circuit reversed. *Freeman*, 625 F.2d at 887. When the case was remanded, N.O.W. had full party standing to litigate all aspects of the case.

The lower court also disregarded the Supreme Court's implicit approval[23] of *Freeman* in *N.O.W.*, 459 U.S. at 809, when it granted N.O.W.'s petition for certiorari without questioning whether N.O.W. had standing to file a petition for certiorari. Importantly, N.O.W.'s petition focused almost entirely on the proper enforcement of Article V, the constitutionality of purported rescissions, and the doctrine of justiciability. It said little about the ERA itself or the importance of equality for all persons. Pet. for Writ of Cert., *Nat'l Org. for Women, Inc. v. Idaho*, No. 81-1283 (U.S. Jan. 8, 1982). If a women's rights organization has standing to invoke the Supreme Court's jurisdiction to address congressional powers under Article V, the constitutionality of purported rescissions, and justiciability, as they relate to the ERA, then Appellants have standing to address the same issues in this case.[24]

2. Appellants Have a Protectable Legal Interest in the ERA's Presumptive Validity

EME et al. also suffered injury because the Archivist's refusal to publish the ERA erected a barrier that makes it more difficult for them to obtain the equal

---

[23] Once a protectable legal interest is identified, a putative intervenor must show that the existing parties do not adequately represent that interest, while Article III standing requires proof of concrete injury.

[24] N.O.W. filed their petition weeks before the parties that brought the suit filed their petition, *see, e.g.*, Pet. of Adm'r of Gen. Servs. for Writ of Cert., *Carmen v. Idaho*, No. 81-1313 (U.S. Jan. 22, 1982), indicating that all agreed N.O.W. had Article III standing because an intervenor would have been unable to file a petition for certiorari without Article III standing. *Diamond v. Charles*, 476 U.S. 54, 68 (1986).

protection benefits of the ERA's presumptive validity. Simply put, EME et al. cannot assert an effective equal protection claim in any matter, including this one, because of the Archivist's actions. *See Carson v. Makin*, 979 F.3d 21, 21–22 (1st Cir. 2020) (organizational plaintiff had standing where government erected a barrier that made it more difficult for them to obtain a benefit); *see also Grutter v. Bollinger*, 539 U.S. 244, 262 (2003) (the injury is the denial of equal treatment).

While the Archivist did not originally cause women's inequality, his refusal to publish the ERA and dissemination of misinformation regarding its validity unlawfully perpetuates the inferior legal status of persons who have long suffered disproportionately high rates of harm because of their inequality.[25] *See Sierra Club v. Marsh*, 872 F.2d 497, 500 (1st Cir. 1985) (injury "consists of the added risk"). That women suffer harm from inequality based on sex is indisputable and intolerable.[26]

---

[25] U.N. General Assembly, *In-Depth Study on All Forms of Violence Against Women: Report of the Secretary General*, A/61/122/Add.1 (6 July 2006) (inequality is root cause of violence against women); U.N. Women, Investing in Gender Equality and Women's Empowerment (Oct. 31, 2010) (available at https://www.endvawnow.org/en/articles/314-investing-in-gender-equality-and-womens-empowerment-.html).

[26] The United States is among the top ten most dangerous nations on earth for women, Thomas Reuters Foundation Survey, June 25, 2018 (survey of 550 experts on women's issues) (available at https://news.trust.org/item/2018061242134-9jrem); and is third most dangerous for sexual violence. *Thomson Reuters Foundation Survey*, June 26, 2018 (survey of 550 experts on women's issues) (available at https://news.trust.org/item/20180612134519).

Appellants have standing to seek redress on behalf of themselves and all women.[27] *Barrows v. Jackson*, 346 U.S. 249 (1953); *Des Vergnes v. Seekonk Water Dist.,* 601 F.2d 9, 14 (1st Cir. 1979). Appellants are affected by government-sanctioned discrimination because inequality injures women in their dignity, autonomy, and humanity,[28] and causes a plethora of other measurable harms.[29] Researchers have even found higher rates of violence among persons such as Katherine Weitbrecht, who are not protected under hate crime laws.[30]

[27] After this lawsuit was filed, another lawsuit to validate the ERA was filed against the Archivist by three state attorneys general, *Virginia et al. v. Ferriero*, 1:20-cv-242-RC (D.D.C. 2020), but attorneys general lack authority to represent the interests of women as a class. *Massachusetts v. Mellon*, 262 U.S. 447, 485–486 (1923) (no state has standing to serve as *parens patriae* of its citizens "as against the Federal Government"). This is the only case through which women and others protected by the ERA have an adequate voice in the determination of the ERA's current legal status.

[28] Jackson, V., *Constitutional Dialogue and Human Dignity: States and Transnational Constitutional Discourse*, 65 MONT. L. REV. 15 (2004); Ho, J., *Finding Out What it Means to Me: The Politics of Respect and Dignity in Sexual Orientation Antidiscrimination*, 2017 UTAH L. REV. 463 (2017) (discussing legal foundations of dignity, autonomy, and humanity in American law).

[29] Kreiger, N., *Discrimination and Health Inequities*, 44 INT'L J. HEALTH SERV. (4) 643, 650 (2014) (meta-analysis showing discrimination's negative health consequences through multiple pathways).

[30] Hatzenbuehler, M. L., et al., *State-Level Polices and Psychiatric Morbidity in Lesbian, Gay, and Bisexual Populations*, 99 AM. J. PUBLIC HEALTH (12) 2275 (2009) (finding higher rates of psychiatric disorders among LGBTQ+ persons who resided in states that did not extend protections against hate crimes and discrimination based on sexual orientation, compared to states that did).

Persons subject to sex inequality also experience harm in the courts. *Brzonkala v. Virginia Polytechnic Institute and State University*, 132 F.3d 949, 971 (4th Cir. 1997) ("Crimes disproportionately affecting women are often treated less seriously than crimes affecting men . . . [there is] overwhelming evidence that gender bias permeates the court system and that women are most often its victims."). Indeed, Congress enacted the Violence Against Women Act to confront "existing bias and discrimination in the criminal justice system." H.R. conf. rep. no. 103-711, at 385 (1994); *see* Senate Judiciary Committee, *The Response to Rape: Detours on the Road to Equal Justice* (May 1993); *see also* Clarke, J., *Frontiers of Sex Discrimination Law*, 115 Mich. L. Rev. 809, 836 (2017) (discrimination against women "creates a self-fulfilling cycle" that "reinforces their subordinate status").

So long as the ERA is not considered valid, sex discrimination claims will be reviewed under a standard of intermediate scrutiny, while claims of discrimination against other classes of people are reviewed under the more protective legal standard of strict scrutiny. Strict scrutiny requires the government to prove that a discriminatory law or policy serves a "compelling government interest," *Plyer v. Doe*, 457 U.S. 202, 215–21 (1982), and demonstrate that each measure taken is the "least restrictive alternative." *Feeley v. Sampson*, 570 F.2d 364, 371 (1st Cir. 1978). Under intermediate scrutiny, the government need only show an "important" rather than a "compelling" interest, and no "least restrictive means" test is applied. *U.S. v.*

*Virginia,* 518 U.S. 515, 532 (1996). Validation of the ERA will require the use of strict scrutiny in sex discrimination cases.[31]

3. The Organizational Appellants Suffered Injury Because the Archivist Interfered with Their Mission and Caused Them to Divert Resources in Order to Identify and Counteract His Unlawful Actions and Inactions

The organizational Appellants suffered injury under *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) because they suffered frustration of mission and diversion of resources to identify and counteract the Archivist's unlawful actions.

*i. Equal Means Equal–Diversion of Resources*

Because of the Archivist's actions, EME is unable to provide ordinary services related to establishing the ERA as a constitutional amendment. It has had to divert resources to identify and counteract the Archivist's unlawful actions. The lower court's reliance on *Boston's Children First v. Boston Sch. Comm.*, 183 F. Supp. 2d

[31] In 1973, a plurality of the Supreme Court extended strict scrutiny review to sex-based classifications. *Frontiero v. Richardson*, 411 U.S. 677 (1973). Three concurring justices objected to the "strictest test of judicial scrutiny" for sex-based classifications on the grounds that ratification of the Equal Rights Amendment was pending before the States, and "if adopted will resolve the substance of this precise question." *Id*. at 692. Interestingly, ratification in the States slowed after 1973. NEALE, T., CONG. RESEARCH SERV., R42979, THE PROPOSED EQUAL RIGHTS AMENDMENT: CONTEMPORARY RATIFICATION ISSUES, 14 (2018). Three years later, the Court overturned *Frontiero* and replaced strict scrutiny with less protective middle-tier scrutiny. *Craig*, 429 U.S. at 217 (Rehnquist, J. dissenting) ("The only redeeming feature of the Court's opinion … is that it [ ] signals a retreat by those who joined the plurality opinion in *Frontiero* … from their view that sex is a 'suspect' classification for purposes of equal protection analysis"); *See Mississippi v. Hogan*, 458 U.S. 718 (1982) (legitimizing use of intermediate scrutiny the day after the ERA ratification extension deadline expired).

382, 403 (D. Mass. 2002) is misplaced. There, the court ruled that the organizational plaintiff suffered no injury despite their expenditure of resources to deal with the defendant's actions because they had only a "mere interest in an event." *Id*. EME's involvement with the ERA can hardly be characterized as a "mere interest." EME has been devoted to the cause of ensuring the ERA's ratification and adoption since 2009 and was instrumental in ensuring its ratification in Nevada, Illinois, and Virginia.

The District Court also ruled that EME suffered no injury because it merely "advised others how to comport with the law, or by virtue of its efforts and expenses to change the law." (J.A. 26). No doubt some organizations advocate for change in the law and suffer no injury under *Havens*. But EME did not divert resources to advise others in how to comport with the law, or advocate for a change in the law. EME diverted resources to counteract the Archivist's unlawful actions. They did this by generating educational materials, and filing this lawsuit, to *counteract* the Archivist's unlawful actions. EME also contacted government officials who were not acting in accordance with the ERA because they were confused about its validity. EME further had to divert resources to educate and inform its members, supporters and the general public about why the ERA is duly ratified despite the Archivist's actions to the contrary, and why government officials should be taking steps to comply with the ERA. (J.A. 53). This diversion of resources establishes Article III standing under *Havens*. *See African Cmtys Together v. Trump*, No. 19-10432-TSH,

2019 U.S. Dist. LEXIS 184688, at 11–12 n.5 (D. Mass. Oct. 25, 2019) (diversion of funds for advocacy efforts to address Defendant's plan to enforce deportation policy establishes standing because "[t]he pivotal inquiry is … whether its activities have been directly impeded by defendant's activities, thus necessitating the diversion of resources"); *see also R.I. Comm'n for Human Rights v. Graul*, 120 F. Supp. 3d 110, 131 n.32 (D.R.I. 2015) (citing *Fair Housing of Mann v. Combs*, 285 F.3d 899, 905 (9th Cir. 2002) for the proposition that investigation and prosecution of defendant's conduct constitutes diversion of resources sufficient to support standing); *accord*, *Smith v. Pac. Props. & Dev. Corp.*, 358 F.3d 1097, 1105 (9th Cir. 2004) (diversion of resources to educate the public sufficient to establish standing); *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1040 (9th Cir. 2015); *Hooker v. Weathers*, 990 F.2d 913, 915 (6th Cir. 1993) (diversion of resources to investigate discriminatory policies sufficient to establish standing); *Jones v. DeSantis*, --- U.S. Dist. Ct. Case No. 4:19-cv-300-RH/MJF at 26 (N.D. Fla. 2020) (expenditure of resources to address confusion caused by government is sufficient diversion of resources and frustration of mission injury to establish standing).

*ii. Equal Means Equal – Frustration of Mission*

The Archivist obstructed EME's core mission because EME has had to focus on education and outreach about the Archivist's actions rather than carrying out its core functions. *See Graul*, 120 F. Supp. 3d at 131 n.32 (education and outreach to

the public about defendant's conduct constitutes frustration of mission injury sufficient to support standing); *see African Cmtys*, No. 19-10432-TSH*; American Canoe Association v. City of Louisa Water and Sewer Commission*, 389 F.3d 536 (6th Cir. 2004) (agency's failure to comply with reporting requirements sufficient to establish standing where lack of access to such information impaired organization's mission); *see also Jones v. DeSantis*, No. 4:19-cv-300.

4. Equal Means Equal–Associational Standing

An organization has associational standing to bring suit "as the representative of its members. . . [e]ven in the absence of injury to itself." *Warth v. Seldin*, 422 U.S. 490, 511 (1975). Associational standing is particularly apt in matters where, as here, the group seeks only equitable relief, rather than money damages. *International Union, United Automobile, Aerospace and Agricultural Implement Workers v. Brock*, 477 U.S. 274, 290 (1986). EME has associational standing because it represents persons protected by the ERA, and advocates for ratification of the ERA on their behalf.[32] *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

---

[32] EME possesses all the indicia of membership. Only members may elect/appoint and serve on the Board of the Directors; EME is financed exclusively by members and supporters, and EME "represents the interests of its members and provides the means by which they express their collective views and protect their collective interests." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 345 (1977).

*i. EME's Members Have Standing in Their Own Right*

EME's members and supporters include many women, such as Appellant Katherine Weitbrecht. As set forth above, they all have an interest in the ERA's continued vitality, thus have standing to sue in their own right. Ms. Weitbrecht asserts additional grounds for standing below.

5. The Yellow Roses – Organizational Standing

The Yellow Roses is a Massachusetts-based volunteer student organization, founded in 2016 by a group of middle school girls who were surprised to learn that women were not yet equal under the U.S. Constitution. The organization's mission is to educate, advocate for and raise public awareness about the ERA. (J.A. 55).

Like EME, the Roses suffered a diversion of resources and frustration of mission because they cannot work to ensure the ERA's ratification and adoption so long as the ERA is perceived to be invalid. *Havens*, 455 U.S. at 379; *Graul*, 120 F. Supp., at 131; *African*, No. 19-10432; *Smith*, 358 F.3d, at 1105; *Hooker*, 990 F.2d at 915; *Jones*, No. 4:19-cv-300.

6. The Organizational Appellants Suffered Injury Because the Archivist Interfered with Their Activities

The organizational Appellants also suffered injury because the Archivist interfered with their ability to actively work toward ratification and adoption of the ERA. *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1397 (9th Cir. 1995) (public interest group has standing to challenge listing of snail under Endangered

Species Act because they were active in getting the snail listed); *Sagebrush Rebellion, Inc. v. Watt*, 713 F.2d 525 (9th Cir. 1983), *aff'd*, 790 F.2d 760 (9th Cir. 1986) (Audubon Society's interest in protection of animals and active participation in proceedings to establish a wildlife sanctuary gave them standing to challenge the validity of that sanctuary); *Trades v. Spellman*, 684 F.2d 627 (9th Cir. 1982), *cert denied*, 461 U.S. 913 (1983) (public interest group has standing in lawsuit challenging legal measure the group had supported).[33]

7. Injury to Katherine Weitbrecht.

In addition to injuries argued above, Ms. Weitbrecht suffered injury from the Archivist's actions because she is a victim of sex-based violence who endured unequal protection and enforcement of the law. She now has heightened vigilance and concern about being less safe because she is female. Ms. Weitbrecht's injuries are thus caused by the Archivist because if he had published the ERA and refrained from declaring it invalid, she would be experiencing less fear and lower risk.

Ms. Weitbrecht is also reluctant to seek redress for "any sex-based harm she may endure" for fear that reporting such crimes will lead to inadequate charges and unjust treatment by law enforcement and the legal system." (J.A. 56–58). This injury

[33] Standing requirements are relaxed when a public interest group is challenging government procedures rather than lack of enforcement. *Northland Family Planning Clinic, Inc. v. Cox*, 487 F.3d 323, 345 (6th Cir. 2007).

was caused by the Archivist's because his actions perpetuate the societal and legal conditions that produce Ms. Weitbrecht's higher risk of unjust treatment. As a member of a class of people who live under constant threat of disproportionate rates of violence, Ms. Weitbrecht has already suffered a sex-based attack, followed by unequal protection of law, because she is female. This is harm she would not be enduring if the Archivist had published the ERA.

## CONCLUSION

For the above reasons, the Judgment of the District Court should be reversed.

Respectfully submitted,

For the Plaintiffs,

/s/ Wendy J. Murphy
WENDY J. MURPHY
C.C.A. # 73902
B.B.O. # 550455
Women's and Children's Advocacy Project
New England Law | Boston
154 Stuart Street
Boston, MA 02116
Phone: (617) 422-7410
wmurphy@nesl.edu

On the brief: Alison Shea, Esq.

Date: December 11, 2020

## CERTIFICATE OF COMPLIANCE

I hereby certify that Appellants' Brief complies with the word limit of Rule 32(a)(7) because it contains 7,930 words, excluding the parts exempted by Rule 32(f). I further certify that this motion complies with Rule 32(a)(5) because it is set in a plain, proportionally spaced typeface, 14-point Times New Roman font.

/s/ Wendy J. Murphy

Wendy J. Murphy

Dated: December 11, 2020

**UNITED STATES COURT OF APPEALS**
**FOR THE FIRST CIRCUIT**

No. 20-1802

EQUAL MEANS EQUAL; THE YELLOW ROSES; KATHERINE WEITBRECHT,
*Plaintiffs-Appellants,*
v.
DAVID S. FERRIERO,
In his Official Capacity as Archivist of the United States,
*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

# ADDENDUM TO APPELLANTS' BRIEF

**TABLE OF CONTENTS**

**U.S. CONST. Art. 1** ........................................................................................1

**1 U.S.C. § 106b** ................................................................................................2

**DISTRICT COURT MEMORANDUM AND ORDER**............................. 3–30

**DISTRICT COURT ORDER OF DISMISSAL**............................................. 31

**U.S. CONST. Art. 5:**

"The Congress, whenever two thirds of both Houses shall deem it necessary, shall propose Amendments to this Constitution, or, on the Application of the Legislatures of two thirds of the several States, shall call a Convention for proposing Amendments, which, in either Case, shall be valid to all Intents and Purposes, as Part of this Constitution, when ratified by the Legislatures of three fourths of the several States, or by Conventions in three fourths thereof, as the one or the other Mode of Ratification may be proposed by the Congress; Provided that no Amendment which may be made prior to the Year One thousand eight hundred and eight shall in any Manner affect the first and fourth Clauses in the Ninth Section of the first Article; and that no State, without its Consent, shall be deprived of its equal Suffrage in the Senate."

**1 U.S.C. § 106b:**

"Whenever official notice is received at the National Archives and Records Administration that any amendment proposed to the Constitution of the United States has been adopted, according to the provisions of the Constitution, the Archivist of the United States shall forthwith cause the amendment to be published, with his certificate, specifying the States by which the same may have been adopted, and that the same has become valid, to all intents and purposes, as a part of the Constitution of the United States."

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| **EQUAL MEANS EQUAL, THE YELLOW ROSES and KATHERINE WEITBRECHT,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**DAVID S. FERRIERO, in his Official Capacity as Archivist of the United States,**<br><br>**Defendant.** | ) | **Case No. 20-cv-10015-DJC** |

**MEMORANDUM AND ORDER**

**CASPER, J.** **August 6, 2020**

## I. Introduction

Plaintiffs Equal Means Equal, The Yellow Roses (together, the "Organizational Plaintiffs") and Katherine Weitbrecht ("Weitbrecht" or "Individual Plaintiff") have filed this lawsuit against David S. Ferriero in his official capacity as Archivist of the United States ( "Defendant" or the "Archivist") alleging constitutional violations and seeking, among other things, an order compelling the Archivist to record all states' ratification of the Equal Rights Amendment (the "ERA") and otherwise prohibiting removal of previously recorded ratifications and an order declaring the Equal Rights Amendment ratified. D. 5 at 3, 25. The Archivist has moved to dismiss for lack of jurisdiction and failure to state a claim under both Fed. R. Civ. P. 12(b)(1) and 12(b)(6).

D. 11. For the reasons stated below, namely that Plaintiffs lack standing, the Court ALLOWS the motion to dismiss, D. 11.

## II. Standard of Review

Pursuant to Fed. R. Civ. P. 12(b)(1), a defendant may move to dismiss an action for lack of subject matter jurisdiction. "[T]he party invoking the jurisdiction of a federal court carries the burden of proving its existence." Murphy v. United States, 45 F.3d 520, 522 (1st Cir. 1995) (quoting Taber Partners, I v. Merit Builders, Inc., 987 F.2d 57, 60 (1st Cir. 1993)). To determine if the burden has been met, the Court "take[s] as true all well-pleaded facts in the plaintiffs' complaints, scrutinize[s] them in the light most hospitable to the plaintiffs' theory of liability, and draw[s] all reasonable inferences therefrom in the plaintiffs' favor." Fothergill v. United States, 566 F.3d 248, 251 (1st Cir. 2009).

A defendant may also move to dismiss for a plaintiff's "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion to dismiss, a complaint must allege "a plausible entitlement to relief." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 559 (2007). Although detailed factual allegations are not necessary to survive a motion to dismiss, the standard "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Id. at 555. "The relevant inquiry focuses on the reasonableness of the inference of liability that the plaintiff is asking the court to draw from the facts alleged in the complaint." Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 13 (1st Cir. 2011).

## III. Background[1]

Unless otherwise noted, the following factual summary is taken from the allegations in the operative complaint and the Court assumes them to be true for the purposes of resolving the motion. McCloskey v. Mueller, 446 F.3d 262, 265 (1st Cir. 2006) (noting that under either rule applicable here that the court "accept[s] the plaintiffs' well-pleaded facts as true and indulging all reasonable inferences in their behoof").

### A. The Parties

David S. Ferriero is the Archivist of the United States and as such is responsible for the National Archives and Records Administration including the recording of states' ratification of constitutional amendments and the amendments themselves. D. 5 ¶ 9; 1. U.S.C. §106b. Equal Means Equal is a national 501(c)(4) organization whose sole purpose is to advocate for women's equality, ratification of the ERA and equal rights for women and girls. D. 5 ¶ 10. Specifically, its goal "is to eradicate sex/gender inequality and advocate for sex/gender equality and fully equal rights for women and men." D. 5 ¶ 59. In 2016, Equal Means Equal produced a documentary film titled "Equal Means Equal" which examined the status of American women who experienced discrimination and considered whether the ERA would mitigate this pattern of discrimination. D. 5 ¶ 60. Equal Means Equal's executive director, Kamala Lopez ("Lopez"), testified in front of the Illinois legislature in support of the ERA. D. 5 ¶ 61. Equal Means Equal has been advocating for state and federal officials to begin the process of examining their laws and regulations, and to take steps "to repair all sex discriminatory provisions," but officials have declined, citing the

[1] The Court ALLOWS *nunc pro tunc* the Plaintiffs' motion to take judicial notice of the States' Amicus Brief filed in Virginia v. Ferriero, 1:20-cv-00242 (D.D.C.), D. 27, and the Court further ALLOWS amici curiae motions, D. 24; D. 28, to file briefs in support of Plaintiffs. The Court has considered the briefs, D. 25, as amended by D. 30; D. 27-1, D. 29, herein but notes that none of them concern the legal issue of standing.

Archivist's refusal to recognize the ERA as ratified. D. 5 ¶ 62. Equal Means Equal further alleges that because the Archivist has refused to recognize the ERA as ratified, women attorneys and other advocates have been reluctant to demand repair work and Equal Means Equal has had to expend significant resources educating its members and members of the general public about why the ERA is duly ratified despite the Archivist's opinion to the contrary. D. 5 ¶ 63. The diversion of these resources, Equal Means Equal asserts, has reduced the amount of resources available to Equal Means Equal that would otherwise be used to assist in the repair work of sex discrimination provisions in anticipation of the ERA taking effect. D. 5 ¶ 63.

The Yellow Roses is an organization of Massachusetts high school students, founded in 2016, for the sole purpose of advocating for ratification of the ERA. D. 5 ¶ 11. The Yellow Roses' mission is to advocate for and raise public awareness about the ratification of the ERA. D. 5 ¶ 66. The Yellow Roses engages in numerous activities including circulating a petition for the ratification of the ERA, interviewing and being interviewed by the media, meeting with state and federal officials to advocate for the equal treatment of women and ratification of the ERA, collaborating with activists and making public appearances to advocate for and teach young people to be activists in their communities. D. 5 ¶ 67. The Yellow Roses asserts that its mission is impaired by the refusal of government officials to begin the process of examining and repairing sex discriminatory laws, regulations and policies and because they cannot effectively advocate on behalf of the ERA so long as the ERA is perceived by government officials as not valid. D. 5 ¶ 69.

Individual Plaintiff Katherine Weitbrecht is a female resident of Norfolk County, Massachusetts. D. 5 ¶ 12. Weitbrecht personally suffered a violent act because she is female when she was strangled in Massachusetts for wearing a rape whistle. D. 5 ¶ 71. Weitbrecht reported the

perpetrator to law enforcement and he was charged with a single count of assault and battery, but Plaintiffs allege that he could not be charged under the Massachusetts hate crime statute, Mass. Gen. L. c. 265 § 39, because sex is not a protected class under that statute. D. 5 ¶¶ 72-73 (citing Mass. Gen. L. c. 265 § 39). Weitbrecht is now reluctant to report any sex-based criminal activity because of that experience. D. 5 ¶ 74. She fears that reporting crimes committed against her because she is female will lead to inadequate charges and unjust treatment by law enforcement and the legal system. D. 5 ¶ 74. Weitbrecht alleges that her rights and well-being are threatened and violated by her lack of full constitutional equality and, as a result, she has been subjected to needless increased risk of violence because of her sex. D. 5 ¶¶ 75, 77.

**B. The ERA**

In March 1972, Congress approved a resolution proposing an Amendment to the Constitution, the Equal Rights Amendment, by a supermajority of each house and submitted it for ratification to the state legislatures. H.J. Res. 208, 86 Stat. 1523 (1972). The resolution includes the text of the proposed amendment and set a seven-year deadline from the date of submission for ratification. The resolution states:

JOINT RESOLUTION

> Proposing an amendment to the Constitution of the United States relative to equal rights for men and women.
>
> > Resolved by the Senate and House of Representatives of the United States of America in Congress assembled (two-thirds of each House concurring therein), That the following article is proposed as an amendment to the Constitution of the United States, which shall be valid to all intents and purposes as part of the Constitution when ratified by the legislatures of three-fourths of the several States within seven years from the date of its submission by the Congress:
> > "ARTICLE-
> > "SECTION 1. Equality of rights under the law shall not be denied or abridged by the United States or by any State on account of sex.

> "SEC. 2. The Congress shall have the power to enforce, by appropriate legislation, the provisions of this article.
> "SEC. 3. This amendment shall take effect two years after the date of ratification.

H.J. Res. 208, 86 Stat. 1523 (1972). States considered the ERA and thirty-five states ratified it, including Massachusetts, before the seven-year deadline passed. D. 5 ¶ 18. Five states also passed resolutions seeking to rescind their prior ratification, see Ratification of the Equal Rights Amendment, U.S. Dep't of Justice, Office of Legal Counsel, 44 Op. O.L.C. at *18–21 (Jan. 6, 2020).

In 1978, as the seven-year deadline approached, Congress passed a joint resolution by the majority of both houses extending the ERA's deadline to June 30, 1982. H.R.J. Res. 638, 95th Cong., 2d Sess., 92. Stat. 3799 (1978). No new states ratified the ERA between 1979 and 1982. D. 5 ¶ 18. One of these five states attempting to rescind the ERA was Idaho, whose rescission, along with Congress's 1978 extension, became the subject of a lawsuit, Idaho v. Freeman, 529 F. Supp. 1107, 1146-50 (D. Idaho 1981). The district court in Freeman held that Congress's 1978 extension was unsuccessful and states may rescind their ratification. Id. at 1146-54. The Supreme Court stayed the district court's judgment and granted certiorari before the Ninth Circuit ruled on the appeal, Nat'l Org. for Women, Inc. v. Idaho, 455 U.S. 918, 102 S. Ct. 1272 (1982) (mem.), but vacated and remanded the case to the district court with instructions to dismiss it as moot after Congress's June 30, 1982 extension of the ratification deadline passed. Nat'l Org. for Women, Inc. v. Idaho, 459 U.S. 809, 103 S. Ct. 22 (1982) (mem.).

### C. Recent Developments with the ERA

In 2012, Defendant issued an opinion letter stating that he would record States' ERA ratification votes if they occurred after expiration of the challenged deadline and publish the ERA if three-fourths of the States voted to ratify it. See Letter from David S. Ferriero, Archivist of the

United States, to Hon. Carolyn Maloney (October 25, 2012), https://www.congress.gov/116/meeting/house/109330/documents/HHRG-116-JU10-20190430-SD007.pdf. In 2017, the ERA regained national attention when Nevada passed a resolution intent on ratifying the ERA. S.J. Res. 2, 79th Leg. (Nev. 2017). Illinois followed suit the following year. S.J. Res. Const. Amend. 0004, 100th Gen. Assemb. (Ill. 2018). The Archivist recorded both Nevada and Illinois's ratifications. D. 5 ¶ 28. Because following Illinois's efforts, thirty-seven states in total had passed resolutions seeking to ratify the ERA, certain members of Congress wrote to the Archivist requesting information as to what actions he would take in the event that a 38th state, the last necessary vote for ratification, attempted to the ratify the ERA. See Letter from Gary M. Stern, General Counsel, Nat'l Archives and Records Admin., to Steven A. Engel, Assistant Attorney General, Office of Legal Counsel, U.S. Dep't of Justice (Dec. 12, 2018), https://www.archives.gov/files/press/press-releases/2020/olc-letter-re-era-ratification-12-12-2018.pdf. Following the inquiry from Congress, on December 12, 2018, the general counsel to the National Archives wrote the Department of Justice, Office of Legal Counsel ("OLC") requesting guidance on the Archivist's responsibilities to record state's efforts to ratify the ERA after the congressional deadlines. Id. On January 6, 2020, the OLC issued a memorandum opinion (the "OLC ERA Opinion") that the "deadline in the proposing clause of the ERA Resolution was a valid and binding exercise of Congress' authority to set a deadline on ratification" and regardless of whether the 1979 Congressional Extension was valid, the ERA deadline has come and gone and, therefore, advised the Archivist not to certify the ERA as ratified if any state subsequently attempted to ratify the ERA. See Ratification of the ERA, 44 Op. O.L.C. at *12, *24. On January 8, 2020, the Archivist issued a statement that he "defers to DOJ on this issue and will abide by the

[OLC ERA Opinion] unless otherwise directed by a final court order." NARA Press Statement on the Equal Rights Amendment (Jan. 8, 2020), https://www.archives.gov/press/press-releases-4.

A week later, the Virginia General Assembly passed a joint resolution intending to ratify the ERA. H.R.J. 1, 2020 Sess. (Va. 2020). As of the date of the filing of the amended complaint in this action, the Archivist had not recorded Virginia as having ratified the ERA, D. 5 ¶ 41, but the Archivist subsequently recorded Virginia's ratification. D. 12 at 30; see Nat'l Archives and Records Admin., Equal Rights Amendment: List of State Ratification Actions (Mar. 24, 2020), https://www.archives.gov/files/foia/pdf/era-list-of-state-ratification-actions-03-24-2020.pdf.

## IV. Procedural History

Plaintiffs instituted this action on January 1, 2020, D. 1, and amended the complaint on February 29, 2020, D. 5. Defendants has now moved to dismiss. D. 11. The Court heard the parties on the pending motion and took the matter under advisement. D. 17.

## V. Discussion

### A. Standing

Article III of the Constitution limits federal courts to deciding cases or controversies. See U.S. Const. art. III § 2; Merrimon v. Unum Life Ins. Co. of Am., 758 F.3d 46, 52 (1st Cir. 2014). The justiciability doctrines of standing and ripeness are rooted in Article III and must be addressed as a threshold inquiry prior to adjudication of the merits of the underlying case. See Reddy v. Foster, 845 F.3d 493, 499-500 (1st Cir. 2017). Standing doctrine reflects both prudential and constitutional limitations. Conservation Law Found. of New England, Inc. v. Reilly, 950 F.2d 38, 40 (1st Cir. 1991).

The constitutional requirement of standing necessitates that a plaintiff show "a concrete and particularized injury in fact, a causal connection that permits tracing the claimed injury to the

defendant's actions, and a likelihood that prevailing in the action will afford some redress for the injury." City of Bangor v. Citizens Commc'ns Co., 532 F.3d 70, 92 (1st Cir. 2008) (internal quotation marks omitted) (quoting Me. People's All. & Nat. Res. Def. Council v. Mallinckrodt, Inc., 471 F.3d 277, 283 (1st Cir. 2006)). As the standing requirement is rooted in the principal that courts should only decide cases and controversies, plaintiffs must allege more than a "'generalized grievance' shared in substantially equal measure by all or a large class of citizens," must assert "his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." Warth v. Seldin, 422 U.S. 490, 499 (1975). The prudential limitations prevent courts from "adjudicating 'questions of broad social import where no individual rights would be vindicated and . . . limit access to the federal courts to those litigants best suited to assert a particular claim.'" Conservation Law Found. of New England, Inc., 950 F.2d at 41 (alterations in original) (quoting Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 804 (1985)). Plaintiffs identify several theories of standing for both organizational and individual plaintiffs. D. 13 at 41-58. Because the Defendant disputes the Plaintiffs' standing to bring these claims, D. 12 at 19-29, this Court turns to this threshold issue.

*1. Standing to All Persons Protected by the ERA*

Most broadly, Plaintiffs assert that all persons protected under the ERA have standing to bring suit. D. 13 at 41-47. Specifically, Plaintiffs argue that all persons that would be protected under the ERA are injured by the Archivist's actions because they have a legal interest in the "continued vitality of the ERA." D. 13 at 41. Plaintiffs also argue that the Archivist's failure to publish the ERA perpetuates the status of women as unequal resulting in disproportionately higher rates of harm because of that inequality. D. 13 at 43. But cognizable injuries must be both concrete and particularized. Spokeo, Inc. v. Robins, ___U.S. ___, 136 S. Ct. 1540, 1548 (2016) (reiterating

that the Court has "made it clear time and time again that an injury in fact must be both concrete and particularized"). These generalized injuries to all those protected by the ERA fail in both respects.

a) Injury to All Persons Protected by the ERA is Not Particularized

As an initial matter, Plaintiffs appear to suggest that since the members of the Organizational Plaintiffs and the Individual Plaintiff are female, they have standing to bring this complaint. D. 13 at 41-42. Such a nation-wide standing principal has been squarely rejected. See Allen v. Wright, 468 U.S. 737, 755-56 (1984), abrogated on other grounds, Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118, 134 (2014). In Allen, the Court rejected the plaintiffs' standing argument by reasoning that "[i]f the abstract stigmatic injury were cognizable, standing would extend nationwide to all members of the particular racial groups against which the government was alleged to be discriminating by its grant of a tax exemption to a racially discriminatory school, regardless of the location of that school." Id. at 755-56. Plaintiffs' theory here is no different. It embraces standing to "all individuals protected by the ERA." D. 13 at 41.

Plaintiffs argue that this case is distinguishable because unlike in Allen, the Plaintiffs here are not merely concerned bystanders. D. 13 at 42. Rather, according to Plaintiffs, "in this unprecedented case where our nation's foundational governing document has been changed, there can be no bystanders" and because women and others protected by the ERA should be guaranteed a "place in the Constitution as fully equal persons, [and] Defendant's actions have denied them that status," they have suffered injury.[2] D. 13 at 42. This argument asserts that because the

[2] Plaintiffs cite the Ninth Circuit's ruling on intervenor's rights in Freeman holding that the interest in the vitality of the ERA was sufficient to allow a women's group to intervene to support their proposition that such a generalized interest is sufficient to confer standing. Idaho v. Freeman, 625 F.2d 886, 887 (9th Cir. 1980). Although the circuits are split on this issue, Mangual v. Rotger-

Plaintiffs' challenge is rooted in the constitution, it is distinguishable from the tax related challenge in Allen. First, the Supreme Court's jurisprudence regarding the requirement that standing be individualized is not limited to its holding in Allen. See Lujan v. Defs. of Wildlife, 504 U.S. 555, 573-74 (1992) (explaining that an injury which "no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy"); Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26, 40 n.20 (1976) (standing requires that plaintiffs "show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent") (internal quotations omitted) (quoting Warth, 422 U.S. at 502). This is because "[a]t bottom, 'the gist of the question of standing' is whether petitioners have 'such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination.'" Massachusetts v. E.P.A., 549 U.S. 497, 517 (2007) (quoting Baker v. Carr, 369 U.S. 186, 204 (1962)). Accordingly, Article III jurisdiction requires that the "party bringing suit must show that the action injures him in a concrete and personal way." Lujan, 504 U.S. at 581 (Kennedy, J., concurring). Second, standing does not exist on a sliding scale in relation to the gravity of the legal issue. The individual is either injured or not, it does not matter how deeply felt the individual's interest in the problem may be. The test "requires more than an

---

Sabat, 317 F.3d 45, 61 (1st Cir. 2003) (acknowledging a circuit split); see Cotter v. Mass Ass'n of Minority Law Enf't Officers, 219 F.3d 31, 34 (1st Cir. 2000) (acknowledging that there may be "unusual cases" where an intervenor could satisfy the interest requirement of Rule 24(a)(2) without having a stake in the controversy needed to satisfy Article III), some have held that Article III standing is not required to intervene, see e.g., Utah Ass'n of Ctys. v. Clinton, 255 F.3d 1246, 1251-52 & n. 4 (10th Cir. 2001). Indeed, the Ninth Circuit has explained that "the Article III standing requirements are more stringent than those for intervention under rule 24(a)." Yniguez v. State of Ariz., 939 F.2d 727, 735 (9th Cir. 1991). Given this distinction and that this Court is not otherwise convinced Plaintiffs' interest in the vitality of the ERA demonstrate an individualized and concrete stake in the outcome here, the Court does not accept the ruling in Freeman as persuasive authority on this issue.

injury to a cognizable interest. It requires that the party seeking review be himself among the injured." Sierra Club v. Morton, 405 U.S. 727, 734-35 (1972).

b) Nor Have Plaintiffs Identified a Concrete Injury Suffered by All Those Protected by the ERA

Although the fact that an injury is widely shared does not defeat a plaintiff's claim to injury, it must nonetheless be sufficiently concrete and individualized. Plaintiffs may plausibly allege standing regardless of "how many persons have been injured by the challenged action" if they plausibly allege that their individual rights have been or will be infringed in some "concrete and personal way." Massachusetts v. E.P.A., 549 U.S. at 517 (quoting Lujan, 504 U.S. at 581 (Kennedy, J., concurring)). In Fed. Election Com'n v. Akins, 524 U.S. 11, 20-25 (1998), the Supreme Court held that voters had standing to challenge the Federal Election Commission's refusal to compel the American Israel Public Affairs Committee to register as a "political committee." Id. The Court identified the injury as a failure to obtain relevant information that was mandated by statute and explained that "the informational injury at issue here, directly related to voting, the most basic of political rights, is sufficiently concrete and specific such that the fact that it is widely shared does not deprive Congress of constitutional power to authorize its vindication in the federal courts." Id. at 24-25.

This is not the case, as was in Akins, where parties have identified a concrete injury—such as a lack of information that is related to their right to vote. Here, the Plaintiffs have not identified a particular injury suffered by all people protected by the ERA generally that concretely or tangibly harms them. Instead, Plaintiffs assert that all individuals that would be protected under the ERA are denied that status of equal person. This theory suffers from two flaws. First, it is not the case that because the constitution does not affirmatively protect rights, it impinges on them. Indeed, some state constitutions protect rights beyond the floor the federal constitution sets, yet courts do

not understand federal constitutional omissions in regard to what states protect to impede or burden those rights. See Am. Legion v. Am. Humanist Ass'n, __U. S__, 139 S. Ct. 2067, 2094 (2019) (Kavanaugh, J., concurring) (recognizing that "the Constitution sets a floor for the protection of individual rights," one that "is sturdy and often high, but it is a floor" and that "other federal, state, and local government entities generally possess authority to safeguard individual rights above and beyond the rights secured by the U. S. Constitution"). Second, the injury plaintiffs allege, is that if the ERA were to be fully recognized, individuals would be afforded more protection under the law than they would be without the ERA. This amounts to no more than an injury flowing from the application of the law and the Supreme Court has made clear that plaintiffs who claim only a harm related to the "proper application of the Constitution and laws. . . [that] no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy." Lujan, 504 U.S. at 573-74.

Plaintiffs attempt to ground their injury arguments in the concrete harm they allege women face as a result of the ERA not being recognized. D. 13 at 43-44. In doing so, Plaintiffs point to several harms women face from society at large. For example, Plaintiffs explain that women face increased and disproportional levels of violence, are subject to bias in education and "offenders of violence against women are less likely to be held responsible compared to offenders of other types of violence." D. 5 ¶¶ 51-58. But these generalized injuries are not cognizable injuries to the class of persons protected by the ERA as a whole. Simon, 426 U.S. at 40 n.20; United Presbyterian Church in the U.S.A. v. Reagan, 738 F.2d 1375, 1378-81 (D.C. Cir. 1984) (finding no standing for a large group of plaintiffs who alleged a "chilling effect" resulting from an Executive Order establishing the framework of foreign intelligence and counterintelligence operation).

Moreover, even assuming these injuries conferred standing upon all women, but see Equal Means Equal et al. v. Dep't of Educ. et al., No. 17-cv-12043-PBS, 2020 WL 1284149, at *7 (D. Mass. Mar. 18, 2020) (rejecting plaintiffs' standing argument that plaintiffs established injury by alleging the denial of equal treatment by the challenged discriminatory conduct), it cannot be said that these injuries are fairly attributable to the Archivist's action. Injuries that stem from independent acts of third parties are ordinarily not cognizable because they are neither fairly traceable to the defendant nor likely to be redressed by the requested relief. See Katz v. Pershing, LLC, 672 F.3d 64, 71-72 (1st Cir. 2012) (explaining that "[b]ecause the opposing party must be the source of the harm, causation is absent if the injury stems from the independent action of a third party"); NAACP, Boston Chapter v. Harris, 607 F.2d 514, 519 (1st Cir. 1979) (agreeing that a federal court can only redress "injury that can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court") (quoting Simon, 426 U.S. at 41-42). The disproportional levels of violence women face, bias in education and the fact gender-based offenders of violence are less likely to be held responsible compared to offenders of other types of violence, all relate to independent acts of third parties: the perpetrators of violence, education systems and those policing violence, not the Archivist.

*2. Individual Plaintiff*

Defendant also challenges the standing of the Individual Plaintiff, Weitbrecht, to bring suit in this instance. D. 12 at 27-29. Plaintiffs assert that Weitbrecht has standing in this action because she "has personally suffered violence and unequal protection and enforcement of the laws based on sex." D. 13 at 54. Weitbrecht experiences heightened vigilance and concern about being less safe because she is female and further alleges a reluctance to seek redress for sex-based harm due

to fear that this will lead to inadequate charges and unjust treatment by law enforcement. D. 13 at 54.

Although Weitbrecht has alleged such harm, that harm does not confer standing in this suit. The injury must be tied to the relief requested to confer standing. Conservation Law Found. of New England, Inc., 950 F.2d at 43 (explaining that the alleged injury was of particular concern because "plaintiffs seek relief far beyond any injury they have established"). The relief requested here, namely the declaration and injunctive relief concerning the ERA, cannot remedy the violence Weibrecht faced and the fact that Weibrecht suffered violence in the past does not establish that she is likely to suffer violence in the future. See Asociación de Periodistas de Puerto Rico v. Mueller, 680 F.3d 70, 85 (1st Cir. 2012).[3]

Weitbrecht's other alleged injuries also do not confer standing in this instance. Weitbrecht also asserts that her "rights and well-being are threatened and violated by her lack of full Constitutional equality because she is not equally protected by the United States Constitution, or Massachusetts law." D. 5 ¶ 75. But as explained above, this type of generalized injury cannot be the basis for a plaintiff's standing because it is neither particularized nor concrete. Indeed, another session of this Court has rejected the assertion that persons denied generalized equal treatment by anticipated discriminatory conduct, alleges injury in fact. Equal Means Equal et al., 2020 WL 1284149, at *7 (holding that such injuries were "merely speculative"). Next, Weitbrecht claims a chilling effect on her speech namely that she is reluctant to seek redress for any sex-based harm

---

[3] Nor can this relief remedy any alleged unequal treatment Weibrecht faced by virtue of the allegation that she is not a member of a protected class under Massachusetts hate crime statute, Mass. Gen. L. c. 265 § 39. D. 5 ¶¶ 72-73. This harm stems from the independent act of a third party—the Massachusetts legislature, and, therefore, is not fairly attributable to the Archivist. See Katz, 672 F.3d at 71 (explaining that "[b]ecause the opposing party must be the source of the harm, causation is absent if the injury stems from the independent action of a third party").

she may endure due to fear that the charges or crimes will be inadequate and she will receive unjust treatment by law enforcement and the legal system. D. 13 at 54-55. To the extent this injury is premised on a First Amendment chill injury, such an injury is "peculiar to the First Amendment context," N.H. Right to Life Political Action Comm. v. Gardner, 99 F.3d 8, 13 (1st Cir. 1996), and despite apparent contentions to the contrary, D. 13 at 55, injuries must be related to the claim brought to assert standing—Plaintiffs bring no First Amendment claim here.[4] In any event, "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." Laird v. Tatum, 408 U.S. 1, 13-14 (1972). "The mere allegation of a 'chill,' . . . will not suffice to open the doors to federal court." Nat'l Org. for Marriage v. McKee, 649 F.3d 34, 47 (1st Cir. 2011). Here, Weitbrecht has alleged only that she has been personally chilled by the Archivist's action, not that this chill was objectively reasonable or that she has suffered any other harm.[5] Blum v. Holder, 744 F.3d 790, 796 (1st Cir. 2014) (reiterating that mere allegations of subjective chill are insufficient to state an Article III injury). For these reasons, the Individual Plaintiff, Weitbrecht, has failed to establish that she has standing to bring this suit.

*3. Organizational and Associational Standing*

Organizational plaintiffs may demonstrate standing by: (1) showing associational standing, i.e., that the member of the organization would have standing to sue as an individual and

[4] To the extent this chill injury asserts that Weitbrecht has been denied access to the courts, D. 13 at 55, this injury cannot be said to be attributable to the Archivist as it involves the independent acts of third parties. Katz, 672 F.3d at 71-72.

[5] Weitbrecht's chill arguments suffer from an additional deficiency—they are not fairly attributable to the Archivist. The fact that Weitbrecht fears that she will receive unjust treatment by law enforcement or the legal system if she reports a crime is not fairly attributable to the Archivist's failure to certify the ERA because it relies on independent acts of third parties. See Katz, 672 F.3d at 71-72.

the interests the organization seeks to protect are germane to its purposes; or (2) by showing that the organizational plaintiffs have standing to sue on their own. See Equal Means Equal et al., 2020 WL 1284149, at *3. In either instance, the organization must demonstrate more than a "mere interest in a problem." Sierra Club, 405 U.S. at 739 (internal quotations omitted). As such, they must make the same showing as is required in the case of an individual: injury, causation and redressability. Havens Realty Corp. v. Coleman, 455 U.S. 363, 378-79 (1982) (explaining that the court "conduct[s] the same inquiry as in the case of an individual" to assess organizational standing). Defendants assert that neither Equal Means Equal nor the Yellow Roses have standing. D. 12 at 20-27. Since Equal Means Equal asserts its basis for standing on both theories (and Yellow Roses asserts standing on the basis of organizational standing), the Court addresses both.

a) Associational Standing

"[A]n association may have standing solely as the representative of its members even in the absence of injury to itself, in certain circumstances." Camel Hair & Cashmere Inst. Of Am., Inc. v. Associated Dry Goods Corp., 799 F.2d 6, 10 (1st Cir. 1986) (citing Warth, 422 U.S. at 511). To meet the Constitution's standing requirement the associations must demonstrate that (1) its members have an injury "that would make out a justiciable case had the members themselves brought suit," Warth, 422 U.S. at 511, and (2) the "interests served by the suit are pertinent to the mission of the organization . . . ." Town of Norwood v. F.E.R.C., 202 F.3d 392, 406 (1st Cir. 2000). Moreover "[r]epresentative standing is inappropriate for prudential reasons, for example, if 'the nature of the claim and of the relief sought' requires the participation of individual members." Parent/Prof'l Advocacy League v. City of Springfield, 934 F.3d 13, 33-34 (1st Cir. 2019).

Plaintiffs assert that Equal Means Equal,[6] has associational standing in this instance because two of its members, Lopez and Weitbrecht, had a cognizable interest in the validity of the ERA. D. 13 at 52-53. The Archivist asserts that it is not apparent from the amended complaint that Equal Means Equal has members at all, much less that Lopez and Weitbrecht were members. Indeed, it does not appear from the amended complaint that Equal Means Equal alleges that it has members that have standing to sue in their own right (although it asserts in its opposition that Lopez and Weitbrecht are members), as the operative pleading does not individually identify any of Equal Means Equal's members. See generally, D. 5. Equal Means Equal alleges that it has "over twenty-thousand active supporters including members of the entertainment and media community," D. 5 ¶ 65, and otherwise alleges that it "engages with its members/supporters who donate funds and volunteer," D. 5 ¶ 61, and that its involvement in this litigation is intended to represent its own interests and the interests of its members/supporters and women at large, D. 5 ¶ 64. Associational standing, however, requires that the organization "at the very least, 'identify [a] member[ ] who ha[s] suffered the requisite harm.'" Draper v. Healey, 827 F.3d 1, 3 (1st Cir. 2016) (quoting Summers v. Earth Island Inst., 555 U.S. 488, 499 (2009)) (alteration in original). Equal Means Equal's failure to allege facts in this regard is alone fatal to its associational standing theory. See Equal Means Equal, 2020 WL 1284149, at *4 (holding that Equal Means Equal's allegations that "they have supporters who 'voluntarily associate[ ] themselves with [Equal Means Equal] . . . is not sufficient to establish standing").

[6] Other than a single line in their surreply brief, D. 22 at 12 n.9, Plaintiffs have not endeavored to argue that the Yellow Roses have associational standing. See D. 13 at 53-54; D. 20 at 6 n.2; D. 22 at 11-12. To the extent that they do make this contention, the Court concludes that they have not made sufficient showing of same.

Even considering the additional facts alleged in its opposition, Equal Means Equal has not established standing. Equal Means Equal asserts in its briefing that Weitbrecht and Lopez are both members and both have standing in their own right. D. 13 at 53. As this Court discussed above, Weitbrecht has not alleged a cognizable injury attributable to the Archivist's action and, therefore, does not have standing in this instance. Nor does Lopez's alleged injury—that she has devoted personal resources and funds to conduct training sessions, produce educational material and communicate with government officials around the country, urging them to disregard Defendant's actions—amount to a concrete injury. D. 13 at 53. As an interest in a problem is insufficient to confer standing, Sierra Club, 405 U.S. at 739 (quotations omitted), Equal Means Equal's associational standing argument fairs no better with respect to Lopez.

b) Organizational Standing

"It is well-accepted in the standing context that organizations may have interests of their own, separate and apart from the interests of their members." Mass. Delivery Ass'n v. Coakley, 671 F.3d 33, 44 n.7 (1st Cir. 2012). Organizational standing is analyzed under the same inquiry as individual standing. That is to say, for an organization to allege standing in its own right, it must allege "(1) an injury in fact, which is (2) fairly traceable to the defendant's misconduct, and which can be (3) redressed through a favorable decision of the court." Sexual Minorities Uganda v. Lively, 960 F. Supp. 2d 304, 324 (D. Mass. 2013). Especially germane to the organizational injury inquiry is whether the injury is sufficiently concrete or merely an abstract social interest. See Havens Realty Corp., 455 U.S. at 378-79; Abigail All. For Better Access to Developmental Drugs v. Eschenbach, 469 F.3d 129, 133 (D.C. Cir. 2006) (explaining that "[t]he court has distinguished between organizations that allege that their activities have been impeded from those that merely allege that their mission has been compromised"). This is because although

organizations may be formed to remedy certain problems or advance certain goals, mere interest in a problem is insufficient to support standing. See Sierra Club, 405 U.S. at 739.

The Supreme Court in Sierra Club addressed the standing of the Sierra Club, a membership corporation group with a special interest in conservation, to bring suit enjoining federal officials from approving an extensive skiing development in the Mineral King Valley. Id. at 729-30. Recognizing that "[t]he Sierra Club is a large and long-established organization, with a historic commitment to the cause of protecting our Nation's natural heritage from man's depredations," the Supreme Court held that this "special interest" in the problem did not satisfy Article III's standing requirements. Id. at 739. This is because if "'special interest' in this subject were enough to entitle the Sierra Club to commence this litigation, there would appear to be no objective basis upon which to disallow a suit by any other bona fide 'special interest' organization however small or short-lived. And if any group with a bona fide 'special interest' could initiate such litigation, it is difficult to perceive why any individual citizen with the same bona fide special interest would not also be entitled to do so." Id. at 739-40. Accordingly, Sierra Club is understood as rejecting the idea that lobbyist or advocacy groups had standing when they assert no injury other than an injury to its advocacy. Ctr. for Law & Educ. v. Dep't of Educ., 396 F.3d 1152, 1162 n.4 (D.C. Cir. 2005) (explaining that "in Sierra Club, the Supreme Court recognized that to hold that a lobbyist/advocacy group had standing to challenge government policy with no injury other than injury to its advocacy would eviscerate standing doctrine's actual injury requirement"); Blunt v. Lower Merion Sch. Dist., 767 F.3d 247, 288 (3d Cir. 2014) (summarizing that "it is clear that a nonprofit entity cannot create standing in a lawsuit in which it has no direct economic interest by having its representatives attend meetings regarding the issue that the entity intends to raise in the suit, or by making expenditures to 'educate' the public on what it regards as the factual or legal

basis for its agenda"); Pa. Prison Soc. v. Cortés, 508 F.3d 156, 163 (3d Cir. 2007) (explaining that organizations are "unable to establish standing solely on the basis of institutional interest in a legal issue").

Organizational injury, however, may also be established when the organization suffers an injury to its organizational activities. For example, in Havens Realty Corp., 455 U.S. at 379, the Supreme Court held that the organizational plaintiff had suffered a concrete injury because the defendant's action impeded the organizational purpose and consequentially caused a drain on its resources. Id. There, HOME, a nonprofit corporation whose purpose was to make equal opportunity in housing a reality in the Richmond metropolitan area, brought suit against a realty company and individual alleging discrimination in violation of the Fair Housing Act. Id. at 368-69. HOME alleged that it had been frustrated by the "defendants' racial steering practices in its efforts to assist equal access to housing through counseling and other referral services" and "has had to devote significant resources to identify and counteract" the defendant's actions. Id. at 379. The Supreme Court explained that "[if as alleged] petitioners' steering practices have perceptibly impaired HOME's ability to provide counseling and referral services for low-and moderate-income home seekers, there can be no question that the organization has suffered injury in fact." Id. The Supreme Court held that "[s]uch concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests." Id.

The Supreme Court differentiated the injury suffered—having to devote significant resources to combat discrimination and thereby impeding its ability to provide counseling services—from the abstract social interest in combatting racial discrimination that the Supreme Court previously found insufficient to state standing in Sierra Club. Id. (citing Sierra Club, 405

U.S. at 739). In Havens, it was not enough that the plaintiff organization was generally interested in combating racial discrimination, rather it was that its activities of providing housing counseling and referral services had been impeded that gave rise to its standing. Id. Havens and Sierra Club together require organizations to have an injury distinct from an interest in the problem. Courts, therefore, do not find standing when the organizational goal is one in the same with the injury because those organizations have only a "mere interest" in a problem. See Lane v. Holder, 703 F.3d 668, 674-75 (4th Cir. 2012) (ruling that a second amendment group whose goal was to promote the exercise of the right to keep and bear arms, educate and research, publishing and legal action focusing on the Constitutional right to privately own and possess firearms did not have standing to challenge firearm law based on its diversion of resources to educate and litigate based on the law); Pa. Prison Soc., 508 F.3d at 162-64 (holding that a group interested in prison rights did not have standing to challenge amendment to Pennsylvania's constitution regarding recommendations of pardons). This is because "[a]n organization's expenses in the pursuit of its agenda are self-effectuating and claiming them as injury-in-fact would allow any advocacy group to manufacture standing by choosing to expend resources to advocate against policy decisions made by the federal government." Blunt, 767 F.3d at 288 (quoting Ctr. For Law and Educ. v. U.S. Dep't of Educ., 315 F. Supp. 2d 15, 24–25 (D.D.C. 2004)).

Yellow Roses and Equal Means Equal are both advocacy organizations. Equal Means Equal's "sole purpose is to advocate for sex equality and ratification of the ERA." D. 13 at 50; D. 5 ¶¶ 10, 59. Yellow Rose's mission is to advocate for and raise public awareness about sex equality and the ERA. D. 13 at 53; D. 5 ¶¶ 11, 66. Both organizations allege that their missions have been frustrated because they assert that the Archivist's refusal to publish the ERA and dissemination of misinformation about its validity has obstructed the organizations' ability to advocate for sex

equality under the ERA. D. 13 at 50, 54. Because the Archivist has not declared the ERA valid, they cannot effectively advocate for equality under it. D. 13 at 49-51, 53-54. The organizations argue that they have had to divert funds away from their advocacy efforts and instead have had to dedicate funds to educating the public about the Archivist's actions. D. 13 at 49-51, 53-54. If these allegations were sufficient to claim standing, an organizational plaintiff would have standing anytime a defendant's action interfered with their organizational goal of advocacy. This is precisely the principal the Supreme Court rejected in Sierra Club when it held that the Sierra Club's special interest in the "[n]ational natural heritage from man's depredations" were not enough to entitle Sierra Club to commence [that] litigation. Sierra Club, 405 U.S. at 739. Undisputedly, the Organizational Plaintiffs are dedicated advocates to women's rights, "but standing is not measured by the intensity of the litigant's interest or the fervor of his advocacy." Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc., 454 U.S. 464, 486 (1982).

Other courts reviewing similar organizational injuries have been reluctant to find standing because such injuries are not distinct from the organizations' mere interest in the problem. For example, the D.C. Circuit has explained that courts do not find standing where "the only 'injury' arises from the effect of the regulations on the organizations' lobbying activities (as opposed to the effect on non-lobbying activities)." Ctr. For Law & Educ., 396 F.3d at 1161. Similarly, the Seventh Circuit has explained that "finding it difficult to advocate and educate on home-sharing in Chicago before a court rules on the individual plaintiffs' challenges to the constitutionality" of an ordinance does not amount to constitutional standing. Keep Chicago Livable v. City of Chicago, 913 F.3d 618, 625 (7th Cir. 2019). Here, the Organizational Plaintiffs allege similarly policy and advocacy based injuries explaining that both had to expend significant resources educating, advocating and "communicating with the public around the country to counteract

Defendant's unlawful actions," D. 13 at 51, and "[t]his has frustrated [the organization's] mission because [they] unable to advocate at all for the repair work that should be already underway, and would already be underway, if the Archivist had not stated his refusal to recognize the ERA." D. 5 ¶ 62; see D. 5 ¶ 63. This interference with organizational advocacy goals is insufficient to confer standing. See Ctr. For Law and Educ., 396 F.3d at 1161; Keep Chicago Livable, 913 F.3d at 625; Food & Water Watch, Inc. v. Vilsack, 808 F.3d 905, 919 (D.C. Cir. 2015) (citing cases and explaining that "[o]ur precedent makes clear that an organization's use of resources for litigation, investigation in anticipation of litigation, or advocacy is not sufficient to give rise to an Article III injury").

Nor are the organizations' efforts to educate members of the public/supporters sufficient to sustain standing. The Organizational Plaintiffs argue that they have devoted resources "to educate and inform members and the general public about why the ERA is duly ratified" despite the Archivist's actions. D. 5 ¶ 63. Essentially, these resources have been devoted to educate the public about the legal status of the ERA, but an organization may not establish "Article III standing merely by virtue of its efforts and expense to advise others how to comport with the law, or by virtue of its efforts and expense to change the law." Fair Elections Ohio v. Husted, 770 F.3d 456, 460 (6th Cir. 2014); see Boston's Children First v. Boston Sch. Comm., 183 F. Supp. 2d 382, 403 (D. Mass. 2002) (rejecting the standing argument that plaintiff "has 'expended considerable resources in providing counseling and information to its members and general public about the challenged . . . policy'").[7]

[7] Plaintiffs argue that Boston's Children First is inapplicable because they argue that the plaintiffs there alleged no diversion of resources or frustrated its mission. D. 13 at 51. As a preliminary matter, it appears that the plaintiffs in Boston Children First did allege a diversion of resources as its argument was based on the "sunk costs" injury the organization sustained as a result of the

To hold otherwise and decide that the Organizational Plaintiffs here, whose purpose is to advocate for the ERA, have standing to assert the constitutional validity of the ERA would be in tension with this Court's obligation to decide only actual cases and controversies. "At bottom the Article III standing limitation prevents a plaintiff from bringing a federal suit to resolve an issue of public policy if success does not give the plaintiff (or one of an associational plaintiff's members) some relief other than the satisfaction of making the government comply with the law." Fair Elections Ohio, 770 F.3d at 460. The Organizational Plaintiffs here ultimately assert that the ERA is the law and advocate for compliance with it. Undoubtedly, the relief the organizations seek would allow them to focus their efforts toward advocacy to state legislatures and may well make their advocacy efforts more effective, but that does not confer standing for these Plaintiffs to bring this suit. See Akins, 524 U.S. at 20 (explaining that the cases and controversies limitation of Article III ensures that "courts will not pass upon. . . . abstract, intellectual problems but adjudicate concrete, living contest[s] between adversaries") (alterations in original) (citations omitted). "Otherwise, the implication would be that any individual or organization wishing to be involved in a lawsuit could create a[n organization] for the purpose of conferring standing, or could adopt [a mission] so that the [organization] expressed an interest in the subject matter of the case, and then spend its way into having standing." Blunt, 767 F.3d at 288.

*4. Procedural Injury*

Plaintiffs also assert a procedural injury in their opposition. D. 13 at 40. "The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all of the normal standards for redressability and immediacy." Lujan, 504 U.S. at 572 n.7.

---

defendant's action. Id. at 403. In any event, the mission the defendant's action impairs here is that of advocacy and "when the service impaired is pure issue-advocacy" standing is not established. PETA v. U.S. Dep't of Agric., 797 F.3d 1087, 1093-94 (D.C. Cir. 2015).

Article III still imposes a "irreducible constitutional minimum" and although Congress is "well position to identify intangible harms" that does not mean that a plaintiff "automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right." Spokeo, Inc., 136 S. Ct. at 1548-49.

Although Plaintiffs do not assert a procedural injury in their complaint, in their opposition they appear to identify 1 U.S.C. § 106b and the Archivist's decision not to certify the ERA as the basis for their procedural injury.[8] D. 13 at 23-25. Plaintiffs argue that Section 106b creates a mandate for the Archivist to record ratified amendments because it provides that the Archivist "shall forthwith cause the amendment to be published." 1 U.S.C. § 106b. Examples of procedural injuries include: an agency's failure to prepare an environmental impact statement, see City of Davis v. Coleman, 521 F.2d 661, 671 (9th Cir. 1975), adoption of a regulation without notice or comment period, United States v. Johnson, 632 F.3d 912, 920-21 (5th Cir. 2011), violation of publication and notification procedural duties prior to an eminent domain taking, Brody v. Vill. of Port Chester, 345 F.3d 103, 108-13 (2d Cir. 2003), and failure to comply with its certification procedures, Int'l Longshoremen's & Warehousemen's Union v. Meese, 891 F.2d 1374, 1379 (9th Cir. 1989). In all these cases, plaintiffs sought to enforce a procedural requirement which could impair their separate concrete interests.

[8] Plaintiffs also assert a procedural right because "thirty-eight states voted to ratify the ERA, thus satisfying Article V" and, therefore, Plaintiffs also have a cognizable legal interest in ensuring compliance with the states' judgment that the ERA is now law. D. 22 at 10-11 n. 7. In support, Plaintiffs cite Salazar v. Buono, 555 U.S. 700, 712 (2010) for the proposition that party who obtains a judgment in his favor "acquires a 'judicially cognizable' interest in ensuring compliance with hat judgment." Here, Plaintiffs have not obtained a judgment in their favor that the ERA is ratified and cannot use their arguments that it is ratified to assert standing to obtain that very judgment.

Even assuming there was some procedural violation here, Plaintiffs "cannot satisfy the demands of Article III by alleging a bare procedural violation." Spokeo, Inc., 136 S. Ct. at 1550. Here, Plaintiffs have not alleged any concrete interest in tandem with the Archivist's failure. It "is not a case where plaintiffs are seeking to enforce a procedural requirement the disregard of which could impair a separate concrete interest of theirs (e.g., the procedural requirement for a hearing prior to denial of their license application, or the procedural requirement for an environmental impact statement before a federal facility is constructed next door to them)." Lujan, 504 U.S. at 572. Rather, here Plaintiffs seek to establish an injury in procedural violation—the Archivist's failure to certify the ERA—and argue that a myriad of generalized consequences (the unequal status of women, violence against women and unequal treatment) flow to all women and all those otherwise affected by the Archivist's failure to act. As this court explained above, this is not a concrete and particularized stake in the outcome. Accordingly, Plaintiffs' procedural standing argument fare no better than their class-wide, individual and organizational arguments.

*5. The Claims Here Further Illustrate That Plaintiffs Do Not have Standing*

Plaintiffs ask, among other things, that this Court declare certain states' purported rescissions invalid and declare the ERA ratified despite the fact that several states have passed intended rescissions of these ratifications. D. 5 at 25. In short, the Plaintiffs ask this Court to adjudicate the efficacy of states ratification, which Freeman observed is "the mechanism whereby the will of the people is expressed." Freeman, 529 F. Supp. at 1128. Standing is meant to sharpen "the presentation of issues upon which the court so largely depends for illumination," Massachusetts v. E.P.A., 549 U.S. at 517 (quoting Baker, 369 U.S. at 204) (internal quotations omitted), but no states are parties in this suit. Freeman and Dyer both considered whether Idaho and Illinois had ratified the ERA. See Dyer v. Blair, 390 F. Supp. 1291, 1308-09 (N.D. Ill. 1975);

Freeman, 529 F. Supp. at 1146-50. Both considered the process by which Idaho and Illinois had approved and rescinded their approval for the amendment. See Dyer, 390 F. Supp. at 1308-09; Freeman, 529 F. Supp. at 1147-50. Freeman and Dyer both considered the states' legislative actions in an attempt to determine the "will of the people of those states." See Dyer, 390 F. Supp. at 1308-09; Freeman, 529 F. Supp. at 1150. Here, the Court does not have before it any state as a party for this litigation but is nonetheless asked to decide their ratifications.

For all of the aforementioned reasons stated, Plaintiffs have not demonstrated standing in this suit. Accordingly, the Court lacks jurisdiction to decide the underlying merits and, therefore, does not address the Defendant's remaining arguments for dismissal. See United States v. AVX Corp., 962 F.2d 108, 113 (1st Cir. 1992) (explaining that "[i]f a party lacks standing to bring a matter before the court, the court lacks jurisdiction to decide the merits of the underlying case").

## VI. Conclusion

For the foregoing reasons, the Court ALLOWS Defendants' motion to dismiss. D. 11.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge

Case 1:20-cv-10015-DJC Document 37 Filed 08/06/20 Page 1 of 1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

**<u>EQUAL MEANS EQUAL</u>**

**V.** **CIVIL ACTION NO. 20-10015-DJC**

**<u>DAVID FERRIERO</u>**

**<u>ORDER OF DISMISSAL</u>**

CASPER, D.J.

In accordance with the Memorandum and Order dated August 6, 2020, the Court Orders that Defendant's Motion to Dismiss is Allowed and the above-entitled action be and hereby is DISMISSED.

August 6, 2020

<u>/s/ Lisa M. Hourihan</u>
Deputy Clerk

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document was served upon the attorneys of record for each party by the ECF filing system. I further certify that hard copies were sent by first class mail to Defendant's counsel of record, and will be hand-delivered to the Court on December 14, 2020.

/s/Wendy J. Murphy

Wendy J. Murphy

Dated: December 11, 2020