No. 20-1802

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT
_____

EQUAL MEANS EQUAL; THE YELLOW ROSES; KATHERINE
WEITBRECHT,
*Plaintiffs-Appellants*,
v.
DAVID S. FERRIERO,
In his Official Capacity as Archivist of the United States,
*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

**Brief of Amicus Curiae Independent Women's Law Center
in Support of Defendant-Appellee David S. Ferriero
and in Support of Dismissal**

Jennifer C. Braceras
First Circuit Bar # 1196930
INDEPENDENT WOMEN'S LAW CENTER
4 Weems Lane, #312
Winchester, VA 22601
Ph.: 202/429-9574
Email: jennifer.braceras@iwf.org
*Counsel for Amicus Curiae*
*Independent Women's Law Center*

# TABLE OF CONTENTS

STATEMENT OF INTEREST ................................................................1

HISTORICAL BACKGROUND .............................................................2

SUMMARY OF THE CASE .................................................................4

ARGUMENT ...................................................................................6

I.  APPELLANTS LACK STANDING. ..............................................6

  A. Equal Means Equal and the Yellow Roses have not suffered any injury in fact...............................................................................7

    1. Appellants lack organizational standing. ...............................7

    2. Appellants lack associational standing. ................................9

  B. The purported harms suffered by Appellants are not attributable to the Archivist...........................................................................10

  C. Injuries alleged by appellants are not redressable by any court..............11

II.  THE E.R.A. IS EXPIRED. ......................................................12

  A. The congressionally imposed ratification deadline passed last century. .12

  B. Even without a congressional deadline, the Constitution forbids ratification across a half-century of seismic legal and social change. ......15

    1. Significant changes in American anti-discrimination law undermine the original rationale for the E.R.A. and raise questions as to its likely impact.........................................................................17

      a. Although the E.R.A. failed, America nevertheless achieved the goal of equal treatment under law. ................................17

      b. Adopting the E.R.A. now, on top of our current anti-discrimination framework, would have consequences to which states have not consented. ...............................................................21

    2. Changed understandings of the word "sex" suggest the E.R.A. today is not the same amendment the states ratified in the 1970s...............24

    3. Changes to the social and economic status of women suggest that state legislators who voted in favor of the E.R.A. in the 1970s might not view it as necessary today.................................................26

CONCLUSION ...............................................................................29

CERTIFICATE OF COMPLIANCE .....................................................31

CERTIFICATE OF SERVICE..............................................................32

# TABLE OF AUTHORITIES

## Cases

*Allen v. Wright*, 468 U.S. 737 (1984) .......................................................10

*Attorney General v. Massachusetts Interscholastic Athletic Ass'n,* 378 Mass. 342, 393 N.E.2d 284 (1979) ................................................................23

*Bostock v. Clayton County*, No. 17-1617, 590 U.S. ___ (2020) ............................25

*Bradwell v. Illinois*, 83 U.S. (16 Wall.) 130 (1873) ................................17

*City of Richmond v. J. A. Croson Co.*, 488 U.S. 469 (1989)...................................21

*Clapper v. Amnesty International USA,* 568 U.S. 398 (2013)……………………...9

*Clark* v. *Arizona Interscholastic Ass'n,* 695 F.2d 1126 (9th Cir. 1982) ................22

*Craig v. Boren*, 429 U.S. 190 (1976) .......................................................21

*Ctr. For Law and Educ. v. Dep't of Educ.,* 396 F.3d 1152 (D.C. Cir. 2005)...........8

*Dillon v. Gloss*, 256 U.S. 368 (1921) ................................................12, 16

*Equal Means Equal v. Dep't of Educ.*, Civil Action No. 17-12043-PBS (D. Mass. March 18, 2020) ........................................................................7

*Faulkner v. Jones*, 10 F.3d 226 (4th Cir. 1993) .......................................22

*Frontiero v. Richardson*, 411 U.S. 677 (1973) .......................................18

*Goesaert v. Cleary*, 335 U.S. 464 (1948)................................................17

*Hoyt v. Florida*, 368 U.S. 57 (1961) .......................................................17

*Idaho v. Freeman*, 529 F. Supp. 1107 (D. Idaho 1982) .........................................14

*Idaho v. Freeman*, 625 F.2d 886 (9th Cir. 1980) ....................................10

*J.E.B. v. Alabama ex rel. T. B.*, 511 U.S. 127 (1994)...................................18

*Katz v. Pershing, LLC*, 672 F.3d 64 (1st Cir. 2012).........................................6, 11

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992)................................6

*Michael M. v. Superior Court*, 450 U.S. 464 (1981)................................22

*National Organization of Women, Int'l v. Idaho,* 459 U.S. 809 (1982)......10, 14, 15

*Orr v. Orr*, 440 U.S. 268 (1979) .......................................................22

*Pitts v. Thornburgh*, 866 F.2d 1450 (D.C. Cir. 1989) ...........................................21

*Reed v. Reed*, 404 U.S. 71 (1971) ................................................3, 11, 18

*Rostker v. Goldberg*, 453 U.S. 57 (1981) ............................................................22

*Sierra Club v. Morton*, 405 U.S. 727 (1972) ...........................................................7

*Simon v. E. Ky. Welfare Rts.*, 426 U.S. 26 (1976) .................................................10

*United States v. AVX Corp.*, 962 F.2d 108 (1st Cir. 1992) ......................................7

*United States v. Virginia*, 518 U.S. 515 (1996) ......................................................18

*Wengler v. Druggists Mutual Insurance Co.*, 446 U.S. 142 (1980) .......................22

*Women Prisoners of D.C. Dep't of Corr. v. District of Columbia*, 93 F.3d 910
   (D.C. Cir. 1996) ...............................................................................................21

## Statutes

15 U.S.C. § 1691(a) ................................................................................................19

20 U.S.C. § 1681 (1972) .........................................................................................18

29 U.S.C. § 206(d) (1963) ......................................................................................18

42 U.S.C. § 2000e (1964) .......................................................................................18

42 U.S.C. § 2000e(k) (1978) ..................................................................................18

42 U.S.C. § 3604 (1974) .........................................................................................19

H.J. Res. 208 (January 26, 1971) ..............................................................................3

H.R.J. Res. 208, 92d Cong., 2d Sess., 86 Stat. 1523 (1972) ..............................3, 12

H.R.J. Res. 638, 95th Cong., 2d Sess., 92 Stat. 3799 (1978) ...................................5

Title IV of P.L. 103-322 (1994) .............................................................................19

## Other Authorities

117 Cong. Rec. 35814–15 (1971) .....................................................................13-14

117 Cong. Rec. 35815 (1971) ...................................................................................3

118 Cong. Rec. 9598 (1972) .....................................................................................3

34 C.F.R § 106.41(c) (1980) ...................................................................................19

Andrew Schepard, *Sex Discrimination and Equal Protection: Do We Need a
   Constitutional Amendment?*, 84 HARV. L. REV. 1499 (1971) ...........................17

Anthony Cilluffo and Richard Fry, *An early look at the 2020 electorate,* PEW
   Research Center (Jan. 30, 2019) .......................................................................16

Ariane de Vogue, *Ruth Bader Ginsburg says deadline to ratify Equal Rights Amendment has expired: 'I'd like it to start over'*, CNN.com (February 10, 2020) ..............................................................................................................29

Beth A. Brooke-Marciniak and Donna de Varona, *Amazing things happen when you give female athletes the same funding as men*, World Economic Forum (Aug. 25, 2016) .................................................................................................28

Bureau of Labor Statistics, *Labor Force Statistics from the Current Population Survey, Table 11: Employed persons by detailed occupation, sex, race, and Hispanic or Latino ethnicity* (2019) .................................................................27

Catalyst, *Women in the Workforce United States: Quick Take* (October 2020)......27

Center for American Women in Politics, *Gender Differences In Voter Turnout*, Eagleton Institute of Politics, Rutgers University (Sept. 16, 2019) ..................29

Claire Cain Miller, *The Problem for Women Is Not Winning. It's Deciding to Run*, N.Y. TIMES, Oct. 25, 2016.................................................................................28

Cristina Richie, *Sex, Not Gender. A Plea for Accuracy*, 51 EXP MOL MED 1 (2019) ..........................................................................................................................25

David C. Huckabee, *Ratification of Amendments to the U.S. Constitution,* CRS REPORT FOR CONGRESS at 2 (Sept. 30, 1997).....................................................13

David Montero, *Thirty-five years past a deadline set by Congress, Nevada ratifies the Equal Rights Amendment*, L.A. TIMES, March 20, 2017 ...............................5

Dept. of Justice, *OVW Grants and Programs* .........................................................24

Enjuris, *Law School Rankings By Female Enrollment (2018)* ................................28

Erika Bachiochi, *The Contested Meaning of Women's Equality*, 46 NATIONAL AFFAIRS (Winter 2021)......................................................................................20

George Guilder, *Women in the Work Force: Gender disparity in the workplace might have less to do with discrimination than with women making the choice to stay at home*, THE ATLANTIC, Sept. 1986...........................................................26

Gretchen Ritter, *Gender and Citizenship after the Nineteenth Amendment*, 32 POLITY 345 (2000).................................................................................................2

Inez Feltscher Stepman, *Don't Revive the ERA,* CITY JOURNAL, Feb. 27, 2020.....21

Jane Kelly, *UVA Law Professor Breaks Down the Implications of the ERA, Just Passed in Virginia*, UVA TODAY, Jan. 16, 2020....................................11, 23, 24

Jeff Jacoby, *The Equal Rights Amendment died in 1979. Let it rest in peace*, BOSTON GLOBE, March 20, 2020 ......................................................................20

Kaia Hubbard and Horus Alas, *The Women of the 117th Congress*, U.S. NEWS & WORLD REPORT, Jan. 12, 2021.............................................................28

Kira Sanbonmatsu, *Women's Underrepresentation in the U.S. Congress,* DAEDALUS (Winter 2020) ..................................................................28

Lesley Kennedy, *How Phyllis Schlafly Derailed the Equal Rights Amendment*, (March 19, 2020)...............................................................................30

Linda Searing, *The Big Number: Women now outnumber men in medical schools*, WASHINGTON POST, Dec. 23, 2019. .................................................28

Lisa Baldez, *The U.S. might ratify the ERA. What would change?,* WASHINGTON POST, Jan. 23, 2020 ..........................................................................23

Lisa N. Sacco, *The Violence Against Women Act (VAWA): Historical Overview, Funding, and Reauthorization*, CONGRESSIONAL RESEARCH SERVICE (April 23, 2019) ................................................................................................20

Maddie Shepherd, *Women-Owned Businesses: Statistics and Overview (2021),* Fundera....................................................................................27

Mario L. Barnes & Erwin Chemerinsky, *The Once and Future Equal Protection Doctrine?*, 43 CONN. L. REV. 1059 (May 2011) ................................18

Marjorie Hunter, *Leaders Concede Loss on Equal Rights*, N.Y. TIMES, June 25, 1982....................................................................................15

Maureen Groppe and Ledyard King, *Virginia becomes 38th state to pass ERA for women, likely setting up issue for courts*, USATODAY, January 15, 2020...........5

NATIONAL ARCHIVES, EQUAL RIGHTS AMENDMENT, LIST OF STATE RATIFICATION ACTIONS (updated March 4, 2020).......................................................4

NATIONAL CENTER FOR EDUCATION STATISTICS, DIGEST OF EDUCATION STATISTICS, *Table 310: Degrees conferred by degree-granting institutions, by level of degree and sex of student: Selected years, 1869-70 through 2021-22* .............27

NATIONAL LEAGUE OF WOMEN VOTERS, A SURVEY OF THE LEGAL STATUS OF WOMEN IN THE FORTY-EIGHT STATES (1930) ........................................2

Noah Berlatsky, *Hey, the Gender-Role Revolution Started Way Before the Millennial Generation*, THE ATLANTIC, May 20, 2013 .......................................2

*Ratification of the Equal Rights Amendment*, Opinions of the Office of Legal Counsel, Slip Op., Vol. 44 (Jan. 6, 2020) ....................................13, 14

Reva B. Siegal, *Constitutional Culture, Social Movement Conflict and Constitutional Change: The Case of the de facto ERA*, 94 CAL. L. REV. 1323 (2006) ...................................................................................................11, 20

Rick Pearson and Bill Lukitsch, *Illinois approves Equal Rights Amendment, 36 years after deadline*, CHICAGO TRIBUNE, May 31, 2018......................................5

Saikrishna Bangalore Prakash, *Of Synchronicity and Supreme Law*, 132 HARV. L. REV. 1220 (2019) .......................................................................................14, 16

Sarah M. Stephens, *At the End of Our Article III Rope: Why We Still Need the Equal Rights Amendment*, 80 BROOK. L. REV. 397 (2015) ................................23

The Center for Legislative Archives, *Martha Griffiths and the Equal Rights Amendment* (Aug. 13, 2020) ...............................................................................2

U.S. Department of Labor Women's Bureau, *Women in the Labor Force*.............26

U.S. Dept. of Agriculture, *Women and Minorities in Science, Technology, Engineering and Mathematics Fields Grant Program (WAMS)*........................24

*Woman-Owned Businesses Are Growing 2X Faster On Average Than All Businesses Nationwide*, BUSINESS WIRE, Sept. 23, 2019 ...................................27

*Women in State Legislatures 2020*, Center for American Women in Politics ........28

Women's Business Enterprise National Council, *Behind the Numbers: The State of Women-Owned Businesses in 2018*....................................................................26

## Constitutional Provisions

U.S. CONST. AMEND. XIV .......................................................................................11

U.S. CONST., ARTICLE V .............................................................................................3

## STATEMENT OF INTEREST

Independent Women's Law Center ("IWLC") is a project of Independent Women's Forum ("IWF"), a nonprofit, non-partisan 501(C)(3) organization founded by women to foster education and debate about legal, social, and economic issues. IWF promotes policies that advance women's interests by expanding freedom, encouraging personal responsibility, and limiting the reach of government. IWLC supports this mission by advocating—in the courts, before administrative agencies, in Congress, and in the media—for equal opportunity, individual liberty, and respect for the American constitutional order.

IWLC opposes Appellants' claim to speak for all (or even most) American women and urges the Court of Appeals to uphold the District Court's ruling dismissing the case for lack of standing. Should the Court decide to rule on the merits, IWLC supports dismissal because the Equal Rights Amendment is expired. Indeed, adding it to the Constitution now would disenfranchise a generation of Americans who have not had an opportunity to be heard, through their elected representatives, on the question of whether the Constitution should require that government treat males and females, not just equally, but the same.[1]

---

[1] All parties have consented to the filing of this brief *amicus curiae*. Neither a party nor a party's counsel authored any part of this brief or contributed funds to its preparation or submission. Only *amicus curiae* and its members have made such contributions.

## HISTORICAL BACKGROUND

In 1923, when suffragist Alice Stokes Paul first proposed a constitutional amendment to guarantee equal treatment of the sexes, American women were second-class citizens who did not possess the same legal rights as men.[2]  Beginning in the 1950s, however, the role of women in society began to change dramatically.[3] In the 1960s and 1970s, American law began to reflect those changes.  *See infra*, Part II.B.1 (describing developments in the law during the 1960s and 1970s that outlawed sex discrimination).

In 1971, in the middle of this period of great legal and cultural change, Representative Martha Griffiths[4] introduced a version of the equality amendment

---

[2] Gretchen Ritter, *Gender and Citizenship after the Nineteenth Amendment*, 32 POLITY 345, 346 (2000) ("while the Nineteenth Amendment diminished the gender distinctiveness of citizenship, it did not create equal citizenship"); NATIONAL LEAGUE OF WOMEN VOTERS, A SURVEY OF THE LEGAL STATUS OF WOMEN IN THE FORTY-EIGHT STATES (1930) (listing state-by-state restrictions on the right of married women to contract and own their own wages in 1930).

[3] *See, e.g.*, Noah Berlatsky, *Hey, the Gender-Role Revolution Started Way Before the Millennial Generation,* THE ATLANTIC, May 20, 2013 (noting that American attitudes towards sex roles, marriage, the family, and women in the workplace changed dramatically from the 1950s through the 1970s).

[4] The Center for Legislative Archives, *Martha Griffiths and the Equal Rights Amendment* (Aug. 13, 2020), https://www.archives.gov/legislative/features/griffiths#:~:text=After%%2020months%20of%20debate%2C%20hearings,seven%2Dyear%20deadline%20for%20ratification.

originally proposed by Alice Paul in the 1920s. Griffiths's version of the Equal Rights Amendment ("E.R.A.") read:

> Equality of rights under the law shall not be denied or abridged by the United States or by any state on account of sex.

H.J. Res. 208 (January 26, 1971).

For a proposed amendment to become law, it must be approved by two-thirds of both Houses of Congress and by three-fourths of the states. U.S. CONST., ARTICLE V. On October 12, 1971, more than two-thirds of the members of the U.S. House of Representatives voted in favor of the E.R.A. 117 Cong. Rec. 35815 (1971). On November 22, 1971, before the Senate voted on the measure, the U.S. Supreme Court held, for the first time, that the Equal Protection Clause of the Fourteenth Amendment prohibits the government from discriminating on the basis of sex against "persons similarly circumstanced." *Reed v. Reed*, 404 U.S. 71 (1971). *Reed* set the stage for a fundamental transformation of the constitutional law of sex discrimination.

On March 22, 1972, the Senate approved by a two-thirds majority an identical version of E.R.A. previously approved by the House. 118 Cong. Rec. 9598 (1972). Congress then sent the E.R.A. to the states for ratification within seven years (*i.e*., by March 22, 1979). H.R.J. Res. 208, 92d Cong., 2d Sess., 86 Stat. 1523 (1972).

Twenty-two (of the necessary 38) states ratified the E.R.A. by the end of 1972. Within the next five years, an additional 13 states ratified the proposed amendment.[5] But, by 1978, five states had rescinded their ratifications or added a sunset provision.[6] Realizing that 38 states were unlikely to ratify the E.R.A. before the 1979 deadline, Congress, *by simple majority*, voted in 1978 to extend the deadline until June 20, 1982.  H.R.J. Res. 638, 95th Cong., 2d Sess., 92 Stat. 3799 (1978).  No additional states ratified the E.R.A. before this "extension" expired.  And no additional states approved of the measure during the 20th century.

## SUMMARY OF THE CASE

The E.R.A. is expired and no longer is pending before the states. Nevertheless, Appellants boldly ask this Court to add it to the Constitution.  Appellants base their

---

[5] The following 35 states ratified the E.R.A. before the congressionally imposed deadline expired: Hawaii, New Hampshire, Delaware, Iowa, Idaho, Kansas, Nebraska, Texas, Tennessee, Alaska, Rhode Island, New Jersey, Colorado, West Virginia, Wisconsin, New York, Michigan, Maryland, Massachusetts, Kentucky, Pennsylvania, California, Wyoming, South Dakota, Oregon, Minnesota, New Mexico, Vermont, Connecticut, Washington, Maine, Montana, Ohio, North Dakota, and Indiana. *See* NATIONAL ARCHIVES, EQUAL RIGHTS AMENDMENT, LIST OF STATE RATIFICATION ACTIONS (updated March 4, 2020) https://www.archives.gov/files/foia/pdf/era-list-of-state-ratification-actions-03-24-2020.pdf

[6] The following five states either revoked or sunset their ratifications: Kentucky, Nebraska, Tennessee, Idaho, and South Dakota.  *Id.*

request on three untimely endorsements of the E.R.A. this century by Nevada (2017), Illinois (2018), and Virginia (2020).[7]

On January 7, 2020, even before the Virginia legislature voted on the matter, Appellants Equal Means Equal, the Yellow Roses, and Katherine Weitbrecht filed this action in the U.S. District Court for the District of Massachusetts against David S. Ferriero, the United States Archivist (the "Archivist"). The complaint sought a declaration that the E.R.A. amends the Constitution when approved by the 38th state. Appellants claimed that 37 states had already ratified the proposed amendment, Comp. ¶ 2, but they failed to account for the five states that revoked their ratifications (either by rescission or sunset).[8] Moreover, they failed to acknowledge that the 35 timely ratifications are expired or that the "ratifications" that occurred this century

---

[7] David Montero, *Thirty-five years past a deadline set by Congress, Nevada ratifies the Equal Rights Amendment*, L.A. TIMES, March 20, 2017; Rick Pearson and Bill Lukitsch, *Illinois approves Equal Rights Amendment, 36 years after deadline*, CHICAGO TRIBUNE, May 31, 2018; Maureen Groppe and Ledyard King, *Virginia becomes 38th state to pass ERA for women, likely setting up issue for courts*, USATODAY, January 15, 2020.

[8] Appellants are, in essence, asking this Court to hold both that the E.R.A. never expires *and* that states may change course over time, but only in one direction (in favor of ratification). Independent Women's Law Center respectfully disagrees. Such a regime would allow the proposed amendment to become part of the Constitution *even if it had the present-day support of only a single state* (if 37 other states that previously approved the measure later voted against it). Because this would clearly violate Article V's requirement that constitutional amendments have the support of large super-majorities, Appellants' arguments fail.

are not ratifications at all, but rather endorsements of a proposal that is no longer live.[9]

On August 6, 2020, U.S. District Judge Denise J. Casper granted the Archivist's motion to dismiss on the ground that Appellants—special-interest groups and a single individual woman—lack Article III standing to demand that the Constitution be amended. Appellants request that this Court reverse the District Court and review the case on the merits.

## ARGUMENT

Appellants do not speak for all (or even most) women and lack standing to bring this case. Even if this Court disagrees, it must reject Appellants' request to bootstrap the E.R.A. to the Constitution, decades after the proposed amendment expired.

## I.    APPELLANTS LACK STANDING.

The Supreme Court has long held that, in order to demonstrate Article III standing to sue, litigants must show that they "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992); *Katz v. Pershing, LLC*, 672 F.3d 64, 71 (1st Cir. 2012)

---

[9] Independent Women's Law Center submits that the first 35 state ratifications expired on March 22, 1979 and cannot be revived.  However, even if Congress's purported "extension" of the deadline until June 20, 1982 were to be valid, it too expired long ago.

(reiterating the tripartite requirement of injury, causation, and redressability in order to sue). Here, Appellants are unable to articulate any particularized harm, let alone one caused by the Archivist, or one that a court can conceivably rectify through this litigation.

### A.    Equal Means Equal and the Yellow Roses have not suffered any injury in fact.

#### 1.    Appellants lack organizational standing.

Appellants Equal Means Equal and Yellow Roses claim that the Archivist's failure to add the E.R.A. to the Constitution has stymied their efforts to "eradicate sex inequality."[10] Plaintiffs-Appellants' Opening Brief at 4 (hereinafter "Opening Brief"). But an organization's interest in advancing (or repealing) particular policies does not establish Article III standing. *Sierra Club v. Morton*, 405 U.S. 727, 738-39 (1972); *United States v. AVX Corp.*, 962 F.2d 108, 114 (1st Cir. 1992). *See also Equal Means Equal v. Dep't of Educ.*, Civil Action No. 17-12043-PBS at 5 (D. Mass., March 18, 2020) (organization lacked standing to challenge federal guidance regarding campus sexual misconduct proceedings despite its "strong interest in the

---

[10] Specifically, Equal Means Equal states that because of the Archivist's failure to act, "it is unable to advocate at all for" legislative bodies to change laws to comply with the E.R.A. Amended Compl. ¶ 62. Similarly, Yellow Roses alleges that its "mission . . . is impaired by the refusal of government officials to begin the process of examining and repairing sex discriminatory laws, regulations, and policies" because they "perceive[]" that the E.R.A. has not been validly enacted. *Id.* at ¶ 69.

rules and procedures that universities follow when considering sexual harassment claims").

The Archivist's appropriate refusal to alter the Constitution without a clear indication that the proposal has the approval of a super-majority of the states (as required by Article V) in no way prevents Appellants from pursuing their mission of eradicating sex discrimination or from lobbying states to adopt (or repeal) particular policies. Appellants remain free to engage in such work and to advocate for legal change.

The fact that Appellants have failed to achieve their policy objectives is not an "injury" that confers standing. *See Ctr. For Law and Educ. v. Dep't of Educ.,* 396 F.3d 1152, 1161-62 (D.C. Cir. 2005) (impact on lobbying activities and frustration of organizational objectives are abstract concerns that do not impart standing). In fact, a contrary holding would allow any women's organization to sue the Archivist, demanding that he add the E.R.A. to the Constitution (or, presumably, demanding that he refrain from so doing). Moreover, it would enable almost *anyone* to fabricate standing by creating a special-interest group and claiming "injury" whenever the government does not immediately adopt the organization's agenda. As any American high school student should know, this is not how policy-making works in this country.

## 2.    Appellants lack associational standing.

Equal Means Equal and Yellow Roses claim to represent "persons protected by the [E.R.A.]"[11] and "women everywhere" who have allegedly suffered injury from the Archivist's inaction. Opening Brief at 27-29; Amended Compl. ¶ 64. But, of course, Appellants do not speak for "women everywhere." Indeed, many women and girls oppose the E.R.A.[12] and do not consider themselves to have suffered harm by the Archivist's inaction. To the contrary, these women and girls believe that *adopting* the E.R.A. would cause them harm by erasing all legal distinctions between males and females. *See infra*, Part II.B.1.b.

Even if Appellants could plausibly claim to speak for all women, which they cannot, their assertions that women are injured by the *risk* of gender-motivated violence and discrimination, Amended Compl. ¶ 46, ¶ 64, ¶ 68, are purely speculative. *See Clapper v. Amnesty International USA*, 568 U.S. 398 (2013) (to demonstrate standing, future injury must be "certainly impending"). Generalized

---

[11] The E.R.A. mentions neither men nor women; instead, it prohibits the abridgement of rights "on account of sex" generally. Because it applies to both males and females, it would seem that Equal Means Equal claims not only to speak for all women, but also for all men.

[12] *See* Amicus Briefs of Concerned Women for America, Document 94-1 (filed 7/24/2020), Independent Women's Law Center, Document 90-1 (filed 7/15/2020), and Eagle Forum, Document 31-1 (filed 5/14/20) submitted in *Virginia v. Ferriero*, D.D.C, 1:20-cv-00242-RC (three major national women's organizations arguing against adoption of the E.R.A.).

concerns about violence and discrimination, however genuine, are not particularized injuries sufficient to establish standing. *See Allen v. Wright*, 468 U.S. 737, 755-56 (1984) (allowing groups concerned about government discrimination to sue "would transform the federal courts into 'no more than a vehicle for the vindication of the value interests of concerned bystanders'") (internal citations omitted). Because Appellants do not allege that any of the people they purport to represent have suffered or will suffer actual, particularized injury from the failure to adopt the E.R.A., their claim of associational standing fails.

### B. The purported harms suffered by Appellants are not attributable to the Archivist.

To the extent Appellants claim they are harmed by gender-motivated violence, Opening Brief at 29-30, any such harm is, obviously, a direct result of actions by individual perpetrators, not by the Archivist of the United States. To the extent Appellants claim they are injured by the failure of states to adopt or repeal particular policies, this "harm" is attributable *either* to Appellants' own failure to proffer convincing arguments as to why their agenda should be adopted *or* to state policy-makers who are not are parties to this lawsuit.[13] *See Simon v. E. Ky. Welfare Rts.*, 426

---

[13] *Compare Idaho v. Freeman*, 625 F.2d 886 (9th Cir. 1980) (National Organization for Women had standing to intervene in a case challenging the authority of states to rescind prior ratifications where the states were actual parties to the suit and where N.O.W. did not initiate the claim as a litigant), vacated as moot, *National Organization of Women, Int'l v. Idaho,* 459 U.S. 809 (1982).

U.S. 26, 41 (1976) (an actual injury is insufficient to establish standing to sue the federal government where the entity that inflicted the injury is not a defendant); *Katz*, 672 F.3d at 76-77 (injury alleged at the hands of some third party, does not satisfy the causation element of the standing inquiry).

### C.     Injuries alleged by appellants are not redressable by any court.

Appellants are not seeking remedies for individual acts of sex discrimination prohibited by American law.[14] Rather, they are seeking to *change* American law to eliminate all legal distinctions between males and females and to prohibit policies with a disparate impact on women as a class.[15] Opening Brief at 23-24. Appellants

---

[14]  If they were, they could hardly assert that the Archivist's action caused them injury, since American constitutional and statutory law *already* outlaw discrimination on the basis of sex. *See infra,* Part II.B.1; *see also* U.S. CONST. AMEND. XIV (government may not "deny to any person within its jurisdiction the equal protection of the laws"); *Reed*, 404 U.S. at 76 (the Fourteenth Amendment forbids "dissimilar treatment for men and women who are thus similarly situated"); Jane Kelly, *UVA Law Professor Breaks Down the Implications of the ERA, Just Passed in Virginia*, UVA TODAY, Jan. 16, 2020, https://news.virginia.edu/content/uva-law-professor-breaks-down-implications-era-just-passed-virginia (government policies that unfairly discriminate on the basis of sex are already prohibited by the Equal Protection Clause of the Fourteenth Amendment).

[15] This interpretation of the E.R.A. goes well beyond the amendment's original goal of equal treatment under law. *See* Reva B. Siegal, *Constitutional Culture, Social Movement Conflict and Constitutional Change: The Case of the de facto ERA*, 94 CAL. L. REV. 1323 (2006) (the drafters of the E.R.A. understood it as a simple non-discrimination measure). Indeed, the Congress that passed the E.R.A. in the 1970s did *not* intend for the amendment to prohibit government policies that take into account personal privacy or physical characteristics unique to one sex. *Id.* at 1381-82, n.156 & n.158 (internal citations omitted).

are, in essence, demanding that the Archivist declare the E.R.A. part of the Constitution so that they may seek to enforce their understanding of it. They seek, not an actual remedy, but a basis upon which to bring further lawsuits. Because a court order requiring the Archivist to add the E.R.A. to the Constitution would afford Appellants no immediate relief, they lack standing to pursue their claim.

## II.    THE E.R.A. IS EXPIRED.

Even if Appellants had standing to bring this case, which they do not, their claim would fail, as the E.R.A. is expired.

### A.    The congressionally imposed ratification deadline passed last century.

The joint resolution passed by Congress on March 22, 1972 clearly states that the E.R.A. will:

> be valid to all intents and purposes as part of the Constitution when ratified by the legislatures of three-fourths of the several States ***within seven years*** from the date of its submission by the Congress.

86 Stat. 1523 (emphasis added).

Accordingly, the E.R.A. expired on March 22, 1979. This should be the end of the matter, but Appellants claim that the Archivist is obliged to ignore the 7-year deadline simply because it is contained in the proposing clause of the Joint Resolution, rather than in the amendment itself.

Congress plainly has the authority to impose a deadline for ratification of a constitutional amendment. *Dillon v. Gloss*, 256 U.S. 368, 375–76 (1921) ("Of the

-12-

power of Congress, keeping within reasonable limits, to fix a definite period for the ratification we entertain no doubt."). Indeed, the 18th, 20th, 21st, and 22d Amendments all included deadlines for ratification within the text and were successfully ratified by three-fourths of the states before their deadlines expired. Beginning with the 23d Amendment, however, Congress began separating ratification deadlines from the text of amendments, so as to avoid cluttering up the Constitution.[16] And the 23d, 24th, 25th, and 26th Amendments were passed with ratification deadlines contained in the proposing clauses, along with the instructions for ratification by the states. The validity of these deadlines was never in doubt, and all four amendments were successfully ratified within the prescribed time frame. The placement of the deadline for ratification of the E.R.A. in the proposing clause is consistent with this long-established practice. The Members of Congress who sponsored the E.R.A., as well as the Members who voted in favor of it, thus, all understood that the 7-year deadline to be valid and proper.[17] *See*, *e.g*., 117 Cong.

---

[16] *Ratification of the Equal Rights Amendment*, Opinions of the Office of Legal Counsel, Slip Op., Vol. 44 at 18-22 (Jan. 6, 2020) ("OLC Opinion"), https://www.justice.gov/olc/file/1232501/download. *See also* David C. Huckabee, *Ratification of Amendments to the U.S. Constitution,* CRS REPORT FOR CONGRESS at 2 (Sept. 30, 1997), https://www.everycrsreport.com/files/19970930_97-922GOV_ebded0a0c9f961ffabb21b4364d260b76a0b8d11.pdf (describing the history and rationale behind ratification deadlines).

[17] Likewise, the state legislatures that considered the E.R.A. had no reason to question whether Congress meant what it said when imposing a 7-year timeframe

Rec. 35814–15 (1971) (remarks of Rep. Griffiths, the E.R.A.'s chief sponsor) ("I think it is perfectly proper to have the 7-year statute [of limitations] so that it should not be hanging over our heads forever."). Indeed, the sole reason that Congress attempted in 1978 to extend the ratification deadline was that it understood the 1979 deadline, which was rapidly approaching, to be binding.

Congress's attempt in 1978 to extend the E.R.A.'s ratification deadline until 1982 is, however, invalid for precisely the same reason that the original deadline *is* valid: Article V's requirement that proposals to amend the Constitution pass by two-thirds of both Houses of Congress. *See Idaho v. Freeman*, 529 F. Supp. 1107, 1152-53 (D. Idaho 1982) (even if Congress were permitted to modify a ratification deadline, it could not do so by a simple majority "in violation of the constitutional requirement that Congress act by two-thirds of both Houses when exercising its article V power."), vacated as moot, *National Organization of Women*, 459 U.S. 809. The 1978 "extension" did not receive the votes of two-thirds of both Houses of Congress, and is, therefore, invalid.[18]

---

for ratification. *See* Saikrishna Bangalore Prakash, *Of Synchronicity and Supreme Law*, 132 HARV. L. REV. 1220, 1296 (2019).

[18] Nor does Congress have the power to extend a ratification deadline retroactively, even by the required two-thirds majority, long after that deadline has expired. *See* OLC Opinion, *supra* n. 14 at 3 ("Congress may not revive a proposed amendment after the deadline has expired.").

In any event, 1982 came and went without any additional states ratifying the

E.R.A.  It was well-understood at that time, by both the courts and the public, that

the E.R.A. was dead.[19]

### B.    Even without a congressional deadline, the Constitution forbids ratification across a half-century of seismic legal and social change.

Even were this Court to set aside the deadline for ratification imposed by

Congress, which it should not, the E.R.A. is expired.[20] The Supreme Court has made

clear that state ratifications must occur in generally the same time period in order to

reflect the true will of the people. Ratifications that are not "sufficiently

---

[19] *See National Organization of Women,* 459 U.S. at 809 (dismissing as moot a challenge to the authority of states to rescind prior ratifications because, even if the deadline were properly extended, the E.R.A. died when that extension passed); Marjorie Hunter, *Leaders Concede Loss on Equal Rights*, N.Y. TIMES, June 25, 1982, https://www.nytimes.com/1982/06/25/us/leaders-concede-loss-on-equal-rights.html (E.R.A. proponents admit failure).

[20] Contrary to Appellants' suggestion, the adoption of the 27th Amendment, 203 years after it was initially sent to the states for ratification, does not support ratification here. To begin with, Congress did not provide an explicit expiration date for ratification of that amendment, as it did with respect to the E.R.A. Further, the 27th Amendment, which prohibits any change in congressional pay from taking effect until the next term of the House of Representatives, is narrow and straightforward, its meaning not altered by the passage of time. The E.R.A., by contrast, contains language that is both sweeping and open to a variety of interpretations. *See infra*, Part II.B.2. In addition, concerns regarding self-dealing with respect to congressional pay raises are no different today than they were in 1789 and are not affected by changed circumstances. By contrast, major changes in American society and law have altered opinions about the status of women and whether they need additional legal protection in the 21st century.

contemporaneous" do not evince a super-majority of support, as required by Article V. *Dillon*, 206 U.S. at 375.

In 2020, fully 37 percent of eligible voters were either Millennials or members of GenZ (meaning that they were born after 1980 and after the E.R.A.'s original 1979 ratification deadline passed), and 25 percent were members of Gen X (meaning that they either were not yet born *or* were too young to vote when the nation last debated the E.R.A.). These voters, who together compose *at least 62 percent of all eligible voters*,[21] are entitled to a full public conversation and debate about the proposed amendment. Denying the people that opportunity would strike a serious blow to the requirement that constitutional amendments be ratified by contemporaneous super-majorities. *Dillon*, 256 U.S. at 375 (ratification must "reflect the will of the people … at relatively the same period").[22] This is particularly true where, as here, *the law, the language, and the culture* have, over a half-century, changed dramatically in ways that impact both the rationale for the amendment and its likely effect.

---

[21] Anthony Cilluffo and Richard Fry, *An early look at the 2020 electorate,* PEW Research Center (Jan. 30, 2019), https://www.pewresearch.org/social-trends/2019/01/30/an-early-look-at-the-2020-electorate-2/.

[22] *See also* Prakash, *supra* n. 17 at 1224 ("Democracy rests upon majority rule. . . [which] surely demands that the putative majority actually demonstrate that it is a majority.").

**1.    Significant changes in American anti-discrimination law undermine the original rationale for the E.R.A. and raise questions as to its likely impact.**

American anti-discrimination law has evolved significantly over the past half-century, such that the state legislators who voted in favor of the E.R.A. in the 1970s necessarily had a very different understanding of what the amendment would achieve.

**a.    Although the E.R.A. failed, America nevertheless achieved the goal of equal treatment under law.**

In 1971, when the House of Representatives approved the E.R.A., courts had yet to hold that the Equal Protection Clause of the Fourteenth Amendment forbids discriminatory treatment of individuals by the government on the basis of sex.[23]  The Supreme Court's unwillingness to strike down policies that discriminated against women had been the driving force behind support for a constitutional amendment to guarantee equality of the sexes.[24]  But while the Senate was debating the E.R.A., the Supreme Court changed course, for the first time using the Equal Protection Clause

---

[23] *See*, *e.g.*, *Bradwell v. Illinois*, 83 U.S. (16 Wall.) 130, 139 (1873) (rejecting an Equal Protection Clause  challenge to the state of Illinois's prohibition on women practicing law); *Goesaert v. Cleary*, 335 U.S. 464 (1948) (upholding a law that banned women from becoming bartenders unless "the wife or daughter of the male owner"); *Hoyt v. Florida*, 368 U.S. 57, 64-65 (1961) (upholding a law that banned women from serving on juries unless they had specifically requested to do so).

[24] Andrew Schepard, *Sex Discrimination and Equal Protection: Do We Need a Constitutional Amendment?*, 84 HARV. L. REV. 1499, 1502 (1971).

to invalidate a law that treated similarly-situated men and women differently. *Reed*, 404 U.S. at 76–77. Over time, the Court broadly applied the equal protection mandate to sex-specific policies. *See Frontiero v. Richardson*, 411 U.S. 677 (1973) (benefits given by the United States military to the family of service members cannot be given out differently on the basis of sex); *J.E.B. v. Alabama ex rel. T. B.*, 511 U.S. 127 (1994) (peremptory challenges based solely on a prospective juror's sex violate the Equal Protection Clause); *United States v. Virginia*, 518 U.S. 515 (1996) (Virginia Military Institute's long-standing male-only admission policy violates the guarantee of Equal Protection). From the perspective of 2021, it is clear that the Equal Protection Clause outlaws governmental policies that unfairly discriminate on the basis of sex. [25]

Today, federal law also contains a plethora of prohibitions on discrimination by both private and public discrimination. *See*, *e.g.*, 29 U.S.C. § 206(d) (1963) (Equal Pay Act) (prohibiting employers from paying similarly-situated men and women unequally); 42 U.S.C. § 2000e (1964) (Title VII) (prohibiting sex-based discrimination in employment); 20 U.S.C. § 1681 (1972) (Title IX) (prohibiting

---

[25] *See* Mario L. Barnes & Erwin Chemerinsky, *The Once and Future Equal Protection Doctrine?*, 43 CONN. L. REV. 1059, 1067-74 (May 2011) (explaining that, although the Equal Protection Clause was "designed to mitigate the effects of slavery on one minority group – Blacks," its language is general, and courts in the modern era have applied it broadly).

public and private educational programs that receive federal financial assistance from discriminating on the basis of sex);[26] 15 U.S.C. § 1691(a) (1974) (Equal Credit Opportunity Act) (prohibiting sex discrimination against credit applicants); 42 U.S.C. § 3604 (1974) (Fair Housing Act) (prohibiting sex discrimination in the sale, rental, and financing of housing); 42 U.S.C. § 2000e(k) (1978) (Pregnancy Discrimination Act) (requiring employers to treat pregnant women the same as other similarly capable employees). *See also* 34 C.F.R § 106.41(c) (1980) (Title IX Athletic Regulations) (requiring that recipients of federal funds with athletic programs provide equal athletic opportunity for members of both sexes); Title IV of P.L. 103-322 (1994) (Violence Against Women Act) (protecting women from criminal acts of gender violence by strengthening the federal penalties for repeat sex offenders, creating the National Domestic Violence Hotline, and authorizing grants

---

[26] During the 1980s and 1990s, the Supreme Court held that sexual harassment can constitute a form of unlawful sex discrimination prohibited by Titles VII and Title IX. *See*, *e.g.*, *Meritor Savings Bank v. Vinson*, 477 U.S. 57 (1986) (a sexually hostile work environment can provide the basis for a claim of sex discrimination under Title VII); *see also Gebser v. Lago Vista Independent School District,* 524 U.S. 274 (1998) (a school's failure to act when notified of teacher-on-student sexual harassment may constitute sex discrimination under Title IX); *Davis v. Monroe County Bd. of Ed.*, 526 U.S. 629 (1999) (a school's failure to act when notified of student-on-student sexual harassment may constitute sex discrimination under Title IX).

-19-

to state, local, and tribal law enforcement entities to investigate and prosecute violent crimes against women).[27]

Constitutional scholars on both the right and the left have, therefore, concluded that "the successful legislative and litigation strategies women's-rights advocates pursued in the early 1970s have given way to a 'de facto ERA.'"[28]  Indeed, no less an authority than the late Justice Ruth Bader Ginsburg, an early supporter of the E.R.A., observed that "[t]here is no practical difference between what has evolved and the E.R.A."[29] Because current law prohibits sex discrimination, the original congressional rationale for the E.R.A. no longer applies, and ratifications from last century are no longer valid.

---

[27] Lisa N. Sacco, *The Violence Against Women Act (VAWA): Historical Overview, Funding, and Reauthorization*, Congressional Research Service (April 23, 2019), https://fas.org/sgp/crs/misc/R45410.pdf.

[28] Erika Bachiochi, *The Contested Meaning of Women's Equality*, 46 National Affairs (Winter 2021), https://nationalaffairs.com/publications/detail/the-contested-meaning-of-womens-equality.

[29] Jeff Jacoby, *The Equal Rights Amendment died in 1979. Let it rest in peace*, Boston Globe, March 20, 2020 (quoting Justice Ginsburg). *See also* Siegal, *supra* n. 15 (the Supreme Court has interpreted the Equal Protection Clause of the Fourteenth Amendment to mean what the E.R.A. would have meant, had it been ratified).

**b.     Adopting the E.R.A. now, on top of our current anti-discrimination framework, would have consequences to which states have not consented.**

Adding the E.R.A. to the Constitution now, would either (1) be merely symbolic or (2) require something more than equal treatment of similarly-situated persons, which current law already requires.  What that "something more" would look like is anyone's guess, but it would certainly differ from anything state legislators thought they approved in the 1970s.

Under current Equal Protection Clause jurisprudence, courts treat sex differently than race. *Compare City of Richmond v. J. A. Croson Co.*, 488 U.S. 469 (1989) (a race-based policy is unconstitutional unless the government can demonstrate that it is *necessary* for the achievement a *compelling* government interest) *with Craig v. Boren*, 429 U.S. 190 (1976) (a sex-based policy is unconstitutional if it is not *substantially related* to the achievement of *important* governmental objectives). The reason for "strict scrutiny" of race-based, but not sex-based, policies is that racial distinctions are almost *never* justifiable – whereas biological sex differences *sometimes* provide relevant grounds for distinction. For example, maintaining separate prisons for male and female inmates makes obvious sense, whereas housing black and white inmates separately does not.[30]

---

[30] *See* Inez Feltscher Stepman, *Don't Revive the ERA,* CITY JOURNAL, Feb. 27, 2020; *see also Women Prisoners of D.C. Dep't of Corr. v. District of Columbia*, 93 F.3d 910, 926 (D.C. Cir. 1996) (citing *Pitts v. Thornburgh*, 866 F.2d 1450 (D.C. Cir. 1989)) (segregating inmates by sex is "unquestionably constitutional").

By recognizing the inherent difference between race and sex, courts have carved out space to accommodate legitimate distinctions between males and females, while still prohibiting discrimination. *Compare Orr v. Orr*, 440 U.S. 268 (1979) (striking down as unconstitutional an Alabama law that said husbands, but not wives, can be required to pay alimony upon divorce) and *Wengler v. Druggists Mutual Insurance Co.*, 446 U.S. 142 (1980) (striking down a provision of Missouri's workers' compensation law that granted death benefits to widows but denied them to widowers in most cases), *with Michael M. v. Superior Court*, 450 U.S. 464 (1981) (upholding a statutory-rape law that made it unlawful for a man to have sex with a woman under eighteen years of age and punished only the male participant) and *Rostker v. Goldberg*, 453 U.S. 57 (1981) (upholding the practice of requiring only men to register for the draft). *See also Clark v. Arizona Interscholastic Ass'n,* 695 F.2d 1126, 1131 (9th Cir. 1982), cert. denied, 464 U.S. 818 (1983) (upholding female only athletic teams) and *Faulkner v. Jones*, 10 F.3d 226, 232 (4th Cir. 1993) (upholding separate public rest rooms for men and women).

Had the E.R.A. been adopted in the 1970s, it is likely the Supreme Court would have interpreted the amendment along the same lines that it interpreted the Equal Protection Clause – *as a prohibition on discrimination against similarly-situated individuals, not as a mandate for the legal erasure of biological sex.* If, however, the E.R.A. is added to the Constitution in 2021, courts will almost certainly

interpret it as imposing strict scrutiny,[31] so as not to render the amendment redundant. This would eliminate any flexibility to allow the separation of the sexes where biology or legitimate privacy concerns are at issue. [32]  Likewise, it could require, not just equal treatment of individuals, but equal societal outcomes for males and females *as groups*.[33]  In practice, this might require women to register for the selective service and require the military to send equal numbers of women and men into combat; it might prohibit the government from operating or funding any female-only spaces, such as women's shelters, sororities, bathrooms, and sports teams;[34] and

---

[31] Although the indeterminant text of the E.R.A. says nothing about the level of scrutiny that should apply to sex-specific policies, many modern-day proponents of the E.R.A. (including Appellants) argue that its adoption now would subject all sex-based classifications to strictest constitutional scrutiny. Opening Brief at 23-24. *See also* Lisa Baldez, *The U.S. might ratify the ERA. What would change?,* WASHINGTON POST, Jan. 23, 2020 (if the E.R.A. passes now, courts will treat sex the same as race, applying the highest level of scrutiny to eradicate all sex-based classifications).

[32] *See* Kelly, *supra* n. 14 ("[T]he ERA would harm women because it would not only bar government discrimination against women, like current law does, it would also ban all distinctions on the basis of sex, including policies designed to benefit girls and women.").

[33] *See* Sarah M. Stephens, *At the End of Our Article III Rope: Why We Still Need the Equal Rights Amendment*, 80 BROOK. L. REV. 397, 418 (2015) (adding the E.R.A. to the Constitution now would "invalidate governmental action that has a disparate impact on gender.")

[34] *See*, *e.g.*, *Attorney General v. Massachusetts Interscholastic Athletic Ass'n,* 378 Mass. 342, 393 N.E.2d 284 (1979) (under the Massachusetts state Equal Rights Amendment, public schools are forbidden from barring males from trying out for or competing on women's sports teams).

it might prohibit hundreds (if not thousands) of programs designed to support women and girls—programs such as the Special Supplemental Nutrition Program for Women, Infants, and Children (WIC), federal grants that attempt to increase the participation of women and girls in STEM programs,[35] and grants administered pursuant to the Violence Against Women Act.[36]  It is unclear whether the state legislators who voted in favor of the E.R.A. in the 1970s understood themselves to be ratifying an amendment that would prohibit all sex-separation and outlaw any policy with a disparate impact on women. Because those are the likely outcomes of ratification today, we cannot assume that state ratifications from the 1970s reflect the will of the people today.

> ## 2. Changed understandings of the word "sex" suggest the E.R.A. today is not the same amendment the states ratified in the 1970s.

The proposed Equal Rights Amendment does not define the term "on account of sex." Whether or not that term's meaning was obvious in 1971, it is far from

---

[35] *See*, *e.g.*, U.S. Dept. of Agriculture, *Women and Minorities in Science, Technology, Engineering and Mathematics Fields Grant Program (WAMS)*, https://nifa.usda.gov/program/women-and-minorities-science-technology-engineering-and-mathematics-fields-grant-program (last visited February 15, 2021).  *See also* Kelly, *supra* n.14 ("State and federal programs to increase female participation in STEM fields, corporate management and business ownership, for example, would likely violate the ERA.").

[36] *See*, *e.g.*, Dept. of Justice, *OVW Grants and Programs* https://www.justice.gov/ovw/grant-programs (last visited February 15, 2021).

obvious today.[37] Indeed, just last Term, the Supreme Court held that a federal statutory prohibition on discrimination "because of sex" includes discrimination because of gender identity. *See Bostock v. Clayton County*, No. 17-1617, slip op. at 33, 590 U.S. ___ (2020) (interpreting Title VII of the Civil Rights Act of 1964). The profound ramifications of this interpretation of the phrase "because of sex" are discussed at length in Justice Alito's *Bostock* dissent. *Id.* at 45-51 (Alito, J., dissenting). Suffice it to say, if the statutory term "because of sex" includes "because of gender identity," then the E.R.A.'s prohibition of different treatment "on account of sex" will almost certainly also be interpreted to prohibit discrimination on the basis of gender identity.

This would have far-reaching implications for all sorts of thorny issues, from bathroom usage and single-sex education to eligibility for single-sex athletic teams. Although Americans could certainly choose to amend the Constitution to resolve permanently these complex issues without exception, the representatives of the people who voted to ratify the E.R.A. in the 1970s did not understand that they were approving a measure that would erase sex altogether. In effect, those states ratified

---

[37]    *See* Cristina Richie, *Sex, Not Gender. A Plea for Accuracy*, 51 EXP MOL MED 1 (2019) (noting that second wave feminism in the United States began using the term "gender" to replace "sex" and that eventually the terms came to be used interchangeably, compromising accuracy.)

a different amendment, one that was overtaken by changed linguistic interpretations and is, therefore, no longer in play.

### 3. Changes to the social and economic status of women suggest that state legislators who voted in favor of the E.R.A. in the 1970s might not view it as necessary today.

Law and language are not the only things that have evolved since the early 1970s. The social and economic status of women also has changed dramatically in the past half-century. Where women in 1972 made up 38.5 percent of the labor force,[38] held only 20 percent of managerial positions,[39] and owned only 4.6 percent of all businesses,[40] women today comprise approximately 47.0 percent of the labor

---

[38] U.S. Department of Labor Women's Bureau, *Women in the Labor Force*, https://www.dol.gov/agencies/wb/data/facts-over-time/women-in-the-labor-force (last visited February 9, 2021).

[39] George Guilder, *Women in the Work Force: Gender disparity in the workplace might have less to do with discrimination than with women making the choice to stay at home*, THE ATLANTIC, Sept. 1986.

[40] Women's Business Enterprise National Council, *Behind the Numbers: The State of Women-Owned Businesses in 2018*, https://www.wbenc.org/news/behind-the-numbers-the-state-of-women-owned-businesses-in-2018/ (last visited February 9, 2021).

force,[41] hold approximately 40 percet of managerial positions,[42] and own 40 percent of American businesses.[43]

These advances are, perhaps, not surprising, given the massive increase in the educational attainment of American women during this same timeframe. While men, as a group, were better educated than women in 1971, today women earn the majority of bachelor's degrees (57.7 percent), master's degrees (61.4 percent), and doctorates (53.3 percent),[44] and they outnumber men in both law school and medical

---

[41] Catalyst, *Women in the Workforce United States: Quick Take* (October 2020), https://www.catalyst.org/research/women-in-the-workforce-united-states/#:~:text=Women%20%20%20Are%20Nearly%20Half%20the,of%20the%20total%20labor%20force.&text=57.1%25%20of%20women%20participate%20in,compared%20to%2069.1%25%20of%20men (last visited February 9, 2021).

[42] Bureau of Labor Statistics, *Labor Force Statistics from the Current Population Survey, Table 11: Employed persons by detailed occupation, sex, race, and Hispanic or Latino ethnicity* (2019), https://www.bls.gov/cps/cpsaat11.htm (last visited, February 9, 2021).

[43] Maddie Shepherd, *Women-Owned Businesses: Statistics and Overview (2021),* Fundera, https://www.fundera.com/resources/women-owned-business-statistics (last visited February 9, 2021). And women are opening up new businesses at twice the rate of men. *Woman-Owned Businesses Are Growing 2X Faster On Average Than All Businesses Nationwide*, BUSINESS WIRE, Sept. 23, 2019.

[44] NATIONAL CENTER FOR EDUCATION STATISTICS, DIGEST OF EDUCATION STATISTICS, *Table 310: Degrees conferred by degree-granting institutions, by level of degree and sex of student: Selected years, 1869-70 through 2021-22* , https://nces.ed.gov/programs/digest/d12/tables/dt12_310.asp (last visited February 9, 2021). By contrast, in 1972, women earned 46.3 percent of bachelor's degrees, 39.7 percent of master's degrees, and 11 percent of doctorates. *Id.*

school.[45]  Since 1972, women have also made great strides in the athletic arena, with the number of women playing college sports increasing 545 percent between 1972 and 2016 and the number of female high school athletes increasing by 990 percent during the same time period.[46]

The political power of American women also has increased exponentially since the 1970s. Today, U.S. female elective office-holding is at an all-time high,[47] and American women are both more likely than men to be registered to vote and

---

[45]  Enjuris, *Law School Rankings By Female Enrollment (2018)*, https://www.enjuris.com/students/law-school-female-enrollment-2018.html#:~:text=North%20Carolina%20Central%20University%20is,%2C%20and%20Northeastern%20(65.76%25) (last visited February 9, 2021); Linda Searing, *The Big Number: Women now outnumber men in medical schools*, WASHINGTON POST, Dec. 23, 2019.

[46] Beth A. Brooke-Marciniak and Donna de Varona, *Amazing things happen when you give female athletes the same funding as men*, World Economic Forum (Aug. 25, 2016)

[47]  Kira Sanbonmatsu, *Women's Underrepresentation in the U.S. Congress,* DAEDALUS (Winter 2020), https://www.amacad.org/publication/womens-underrepresentation-us-congress. Since 1971, the number of women serving in state legislatures has more than quintupled.  *Women in State Legislatures 2020*, Center for American Women in Politics, https://cawp.rutgers.edu/women-state-legislature-2020 (last visited February 9, 2021). In 2021, women hold at least 27% of the seats in the U.S. Congress, the highest percentage in history.  Kaia Hubbard and Horus Alas, *The Women of the 117th Congress*, U.S. NEWS & WORLD REPORT, Jan. 12, 2021. Significantly, when they choose to run for political office, women are as likely as men to win. Claire Cain Miller, *The Problem for Women Is Not Winning. It's Deciding to Run*, N.Y. TIMES, Oct. 25, 2016.

more likely than men actually to vote.[48] All of this remarkable progress has been achieved without amending the Constitution or erasing all sex-specific laws.

Due to the legal, linguistic, and societal changes outlined above, all state ratifications from the 1970s are today expired and no longer valid. As such, they cannot now be used to cobble together a faux super-majority in favor of amending the Constitution. Rather, today's voters must be given an opportunity to consider, in light of current circumstances, whether they wish to make the E.R.A. a permanent part of the U.S. Constitution.

## CONCLUSION

The only way to determine, consistent with Article V, whether large super-majorities of Americans today want to adopt the E.R.A. is, in Justice Ginsburg's words, to put it "back in the political hopper"[49] and start again. Only then can we have a truly contemporaneous national conversation about sex discrimination and about the advantages and disadvantages of this proposed amendment.

It is, of course, worth noting that the last time the citizens of the United States had such a national conversation about the merits of the Equal Rights Amendment,

---

[48] Center for American Women in Politics, *Gender Differences In Voter Turnout*, Eagleton Institute of Politics, Rutgers University (Sept. 16, 2019), https://cawp.rutgers.edu/sites/default/files/resources/genderdiff.pdf.

[49] Ariane de Vogue, *Ruth Bader Ginsburg says deadline to ratify Equal Rights Amendment has expired: 'I'd like it to start over'*, CNN.com (February 10, 2020).

its ratification went from being seemingly inevitable to dead in its tracks.[50] This Court should not allow E.R.A. proponents to short-circuit the constitutionally prescribed process simply because they are afraid to lose again.

Date: February 17, 2021

Respectfully submitted,

*/s/ Jennifer C. Braceras*
First Circuit Bar No. 1196930
INDEPENDENT WOMEN'S LAW CENTER
4 Weems Lane, #312
Winchester, VA 22601
Ph.: 202/429-9574
Email: jennifer.braceras@iwf.org
    *Counsel for Amicus Curiae*
    *Independent Women's Law Center*

---

[50] Lesley Kennedy, *How Phyllis Schlafly Derailed the Equal Rights Amendment*, (March 19, 2020), https://www.history.com/news/equal-rights-amendment-failure-phyllis-schlafly (noting that the ERA was on track to become the 27th amendment to the U.S. Constitution until a grassroots movement halted its momentum),

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Rules 29(a)(5) and 32(a)(7) because it contains 7,219 words, excluding the items that may be excluded.

This brief also complies with the typeface and type-style requirements of Rules 32(a)(5)-(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman 14-point font.

*/s/ Jennifer C. Braceras*

**CERTIFICATE OF SERVICE**

I e-filed filed this brief with this Court via CM/ECF. All participants in this case are registered CM/ECF users, and service will be accomplished via CM/ECF.

Dated: February 17, 2021                    */s/ Jennifer C. Braceras*